[No. 60084-8.    En Banc.    December 16, 1993.]

*In the Matter of the Dependency of* J.B.S.

TERESA SCOTT, ET AL, *Petitioners*, v. THE DEPARTMENT
OF SOCIAL AND HEALTH SERVICES, ET AL, *Respondents.*

*Speidel Law Firm* and *Earl W. Murdock,* for petitioner Teresa Scott.

*Bogle & Gates, Evan L. Schwab, David R. Goodnight,* and *Douglas R. Davis; Stansfield & Schuler* and *Mark E. Stansfield,* for petitioner J.B.S.

*Christine O. Gregoire, Attorney General,* and *Lesley A. Allan* and *Jill B. Keller, Assistants,* for respondent State.

*Daniel M. Arnold* of *Central Washington Legal Defenders,* for respondent Blas Beltran.

*Deborah Perluss* and *Gillian Dutton* of Evergreen Legal Services; *Mary Jenner* of Puget Sound Legal Assistance Foundation; *Jay W. Stansell* and *Robert Pauw* on behalf of Northwest Immigrant Rights Project, amici curiae.

UTTER, J. — This is an appeal from a superior court refusal to reconsider a juvenile court order changing placement of a dependent child from his foster family in Washington to the custody of his father who resides in Mexico. We reverse the Superior Court and remand for a review hearing pursuant to RCW 13.34.130(5).

J.B.S., a minor child and citizen of the United States, is the son of Teresa Scott (the mother) and Blas Benicio Beltran (the father). J.B.S. was born in the United States on April 16, 1989, when his mother was 15 years old and his father approximately 19. Report of Proceedings (Oct. 16, 1992), at 57. The father left the home 2 months after the child's birth. Order on Motion for Change of Placement, at 3; Clerk's Papers vol. 1, at 36. The mother, a minor, continued to care for J.B.S. until he was over a year old. Clerk's Papers vol. 2, at 137. She then left him to be cared for by a friend. Clerk's Papers vol. 2, at 137.

Shortly thereafter, in January 1991, a petition was filed in the Chelan County Juvenile Court alleging J.B.S. was a dependent child. Clerk's Papers vol. 3, at 269. Mr. Beltran, whose whereabouts were unknown, was identified by the mother as J.B.S.'s father. Clerk's Papers vol. 3, at 269. Following a contested hearing, a dependency order was entered on May 2, 1991, finding J.B.S. dependent pursuant to RCW 13.34.030(2)(a) and (c). Clerk's Papers vol. 3, at 257-59. Pursuant to that order, the court required the mother to attend parenting classes, submit to a psychological evalua-

tion, attend school, participate in counseling and establish a suitable home for J.B.S. Clerk's Papers vol. 3, at 235.

From January to November 1991, the mother complied with the recommendations of the Department of Social and Health Services (Department). Clerk's Papers vol. 1, at 35; Clerk's Papers vol. 3, at 229. She underwent a psychological evaluation, took parenting classes, received counseling and visited J.B.S. regularly. Clerk's Papers vol. 3, at 229. Because she was a minor with no home of her own, the Department offered to find her a foster home.

In November 1991, the mother disappeared for 2 months. Report of Proceedings (Oct. 9, 1992), at 23. Contact between the Department caseworker and the mother was reestablished when the mother was sent to a juvenile detention facility in Wenatchee pursuant to a theft charge. Report of Proceedings (Oct. 9, 1992), at 23.

Upon learning of the mother's return to the area, the caseworker contacted her in the detention facility in January of 1992. Clerk's Papers vol. 1, at 35. Report of Proceedings (Oct. 9, 1992), at 23. At that time, the mother, still a minor, indicated she wished J.B.S. to be adopted by the foster family because she thought it was a better home for J.B.S. than she could provide at that time.[1] Report of Proceedings (Oct. 9, 1992), at 24-25.

The Department appears to have treated the mother's decision to permit J.B.S. to be adopted by his foster parents as a final decision to abandon him. Apparently because it believed the dependency statute required it to do so, the Department sought a blood relative with whom the child could be placed instead.

The Department located the biological father, who at the time was incarcerated on a conviction for possession and delivery of cocaine. Clerk's Papers vol. 1, at 36. Until the Department contacted him, J.B.S.'s father had had no contact whatsoever with J.B.S. since leaving the child and his mother when J.B.S. was 2 months old. The Department inquired whether he would be interested in forming a bond

---

[1]The mother's youngest child was recently adopted by the foster parents.

with J.B.S. so that J.B.S. ultimately might be placed with him. The father agreed.

In January 1992, the father was deported to Mexico and, as a controlled substance trafficker, is an "excludable" alien pursuant to 8 U.S.C. § 1182(a)(2)(C). Clerk's Papers vol. 1, at 36. Report of Proceedings (Nov. 19, 1992). The father maintained contact with the caseworker after his return to Mexico. Report of Proceedings (Oct. 9, 1992), at 28. On learning of the review hearing set for February 26, 1992, the father illegally returned to Washington. Report of Proceedings (Oct. 9, 1992), at 30.

At a hearing on February 27, 1992, the juvenile court commissioner adopted the Department's recommendation that J.B.S. continue to reside with his foster family until he could be placed with his father. Clerk's Papers vol. 2, at 161; Clerk's Papers, vol. 3, at 191; see Report of Proceedings (Dec. 1, 1992), at 7.

Before his second deportation a few months later, the father completed parenting classes, a psychological examination, a substance abuse evaluation and a drug and alcohol awareness program. Clerk's Papers vol. 2, at 155. Report of Proceedings (Nov. 19, 1992), at 21-22. He also visited J.B.S. twice a week under Department supervision. Clerk's Papers vol. 1, at 61.

In December 1992, the Department filed a motion for an order changing placement from the foster family to the father. Clerk's Papers vol. 1, at 47-49. Hearings were held before the juvenile court commissioner on October 9, 16, and 20, 1992.

At those hearings the mother told the court that she now had a home and wished to have J.B.S. return to live with her. See Report of Proceedings (Oct. 9, 1992), at 8. The foster mother testified the child was very attached to his mother, that "[h]e is always glad to see her. He's always wanting to be around her. He talks about her when she's not there. Wants to call her on the phone." Report of Proceedings (Oct. 16, 1992), at 72. The guardian ad litem reported the foster parents were providing an exceptional

home for the child, and also indicated the child was attached to his mother. Report of Proceedings (Oct. 20, 1992), at 31-32. The guardian later expressed grave concern about placing J.B.S. in a country whose language he did not speak, to live among virtual strangers. Report of Proceedings (Dec. 30, 1992), at 93.

The juvenile court commissioner entered an order on November 19, 1992. Clerk's Papers vol. 2, at 128. The court found the mother was not capable of caring for J.B.S. "at this time", indicating she had not cooperated with the Department and had visited J.B.S. without Department approval. Clerk's Papers vol. 2, at 129-30. Shortly thereafter, the trial court commissioner ordered the child placed with the father in Mexico. Clerk's Papers (Order on Motion for Change of Placement) vol. 1, at 47-49. Report of Proceedings (Dec. 17, 1992).

The mother sought to stay the juvenile court's order in superior court. Clerk's Papers vol. 1, at 56. The guardian ad litem also filed a motion to revise the juvenile court's decision. Clerk's Papers vol. 1, at 42.

Superior Court Judge Carol Wardell upheld the juvenile court's decision by written order on December 31, 1992. Report of Proceedings (Dec. 30, 1992); Report of Proceedings (Dec. 31, 1992); Clerk's Papers vol. 1, at 34-41. She relied on the commissioner's finding that the mother had not been found to be a suitable placement option "at this time". Clerk's Papers vol. 1, at 36. She also reasoned that she could not make the placement determination according to the child's best interests. See Report of Proceedings (Dec. 30, 1992), at 86-87. The mother filed a notice of discretionary review with the Court of Appeals, Division Three. Review was granted and the case certified to this court.

The mother's parental rights were never terminated, and there is no evidence she ever abused or neglected J.B.S. It is uncontested that she has established a home, and has been caring for her eldest, a 5-year-old girl, in that home since October 1992. See Clerk's Papers (Order on Motion for Change of Placement) vol. 1, at 47-49; Clerk's Papers vol. 2,

at 129. The Department social worker testified the mother has complied with the psychological evaluation and has entered counseling. She has regularly visited J.B.S. at the foster parents' house, albeit without Department approval, except for the brief 2-month period she was in juvenile detention. Report of Proceedings (Oct. 9, 1992), at 54-56. The Department has resisted her requests for increased visitation, although there is no indication in the record that such visits would harm J.B.S. See Department's Motion for Partial Relief From Stay and Response to Mother's Motion for Partial Relief From Stay.

J.B.S.'s entire contact with his father, aside from the first 2 months of his life, consists of weekly visits arranged by the Department over a 6-month period. The Department's plan is for J.B.S. to reside in Comala, Mexico, with his father. Clerk's Papers vol. 1, at 59. J.B.S. would live with his father's relatives and would be cared for by his father's mother, who speaks no English, during the day. Clerk's Papers vol. 1, at 61; Report of Proceedings (Oct. 9, 1992), at 37-38. The Department recognizes that J.B.S. does not know these relatives, and does not speak Spanish.

Because we reverse this case on statutory grounds, we do not reach the constitutional issues the parties raise. These include whether the mother's constitutional rights were violated by the superior court order or by the Department's actions; whether the Superior Court violated J.B.S.'s constitutional interests of family association or his constitutional right to remain in the United States; and whether the Department's assistance to the father after he illegally reentered the United States violated the supremacy clause of the United States Constitution.

The parties also argue over whether the Superior Court erred in awarding physical custody of J.B.S. to Mr. Beltran without first requiring a paternity order. We need not reach this issue because we reverse and remand on other grounds.[2]

---

[2]We note that a paternity order was entered on April 27, 1993, and further proceedings are pending this order. See State v. Beltran, cause 13298-6-III.

I

## The "Best Interests of the Child" Standard

J.B.S., his mother, and the guardian ad litem correctly maintain the Superior Court erred in failing to give J.B.S.'s interests paramount consideration.

The Superior Court demonstrated exemplary care and thoroughness in reviewing the record. We reverse its decision in this case, however, because its decision to affirm the commissioner's order placing J.B.S. in Mexico was based on a fundamental misapprehension of its obligations under the statute. We take this opportunity to clarify any uncertainty in the law that may exist in this regard.

The Superior Court specifically found that J.B.S. would suffer separation anxiety or trauma if placed in Mexico with his father, but thought the statute compelled his placement there nevertheless. See Clerk's Papers (Order Denying Motion for Revision) vol. 1, at 37. The record reveals the trial court's decision was premised on the assumption that the dependency statute constrained it from giving effect to J.B.S.'s best interests: "[T]his court doesn't have as its sole basis for a decision the best interests of the child. It's governed by the statute." Report of Proceedings (Dec. 30, 1992), at 110; 86-87. "*[T]he case law says [the] best interests of the child comes basically as a **secondary** issue.*" (Italics and boldface ours.) Report of Proceedings (Dec. 30, 1992), at 86-87.

■ There is no support in the legislative scheme for the notion that a biological parent's rights must override a child's best interests in determining placement under the dependency statute. To the contrary, the pertinent statute, RCW 13.34.020, was amended in 1987 to expressly reflect the Legislature's concern to assure the child's interests be given due consideration, and prevail in case of conflict with the parents':

> [T]he legislature declares that the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized. *When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, **the rights and***

*safety of the child should prevail.* The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter.[3]

(Italics and boldface ours.) RCW 13.34.020. Laws of 1990, ch. 284, § 31.

The Superior Court implicitly found the rights of the father and J.B.S. were in conflict, insofar as the court found that J.B.S. would be traumatized if required to move to Mexico to live with his father. That finding is amply supported in the record. Indeed, the only expert evidence presented indicated it would seriously harm J.B.S. to be severed from contact with his foster parents, his mother and his siblings.[4] To the extent J.B.S.'s rights conflicted

---

[3]Before it was amended in 1987, the section made no reference to the child's interests, specifying only that "[T]he legislature declares that the family unit should remain intact in the absence of compelling evidence to the contrary." Laws of 1977, 1st Ex. Sess., ch. 291, § 30.

[4]The only expert in this case indicated as follows:

"[J.B.S.] has developed a strong bond with the entire [foster] home environment. He sees [T.] as his brother and [A.] as his sister. He calls Mrs. Epoch [his foster mother] "Mommie" and easily crawls up on Mr. Epoch's lap. Mr. Epoch provides all of the child care every other weekend due to his wife's work schedule as a nurse. Both of the boys enjoy helping Mr. Epoch do outside caring for the dog, the horse, and other chores. Mrs. Epoch has a large extended family that is actively involved with [J.B.S.].

". . . .

"The Epochs are invested in following the principles of an open adoption that would support both [J.B.S.'s] mother and his father having a continuing relationship with [J.B.S.]. Presently, [J.B.S.] is well adjusted, open and warm. The time that he has spent with the Epochs appears to have been extremely nurturing for him. He communicates well within the family and is able to express himself clearly.

". . . .

"It is my opinion that it is in [J.B.S.'s] best short- and long-term interest to stay with the Epochs and to be adopted by them. It would be traumatic for him to be removed from their home. *It would be additionally disturbing for him to leave [T.], who [sic] he relates to as his brother, and his sisters with whom he plays, and his mother who has an **integrated** role in his life.* . . . It is often times difficult for a child who is well bonded to a family setting to develop an equally secure bond in a new family setting if the child is abruptly removed from the first family. [J.B.S.'s] secure, warm and trusting bond in his present living situation makes it very likely that he would be negatively affected for his entire life if he were removed from his present living situation." (Italics and

with those of his father, the commissioner and Superior Court should have given effect to J.B.S.'s interests. *See* RCW 13.34.020.

Not only does the statute indicate the child's interests should prevail, so too does the pertinent case law. This court has repeatedly held that the child's "best interests" is the primary consideration in deciding a petition for modification of an order regarding custody of a dependent child. *In re Boatman*, 73 Wn.2d 364, 368, 438 P.2d 600 (1968); *see In re Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980) (citing *In re Becker*, 87 Wn.2d 470, 553 P.2d 1339 (1976); *In re Sego*, 82 Wn.2d 736, 738, 513 P.2d 831 (1973)).

Both the Department and the father argue that RCW 13.34.020 "required" J.B.S.'s transfer to the father. See Brief of Respondent Beltran, at 19; Brief of Respondent Department, at 12-13. It is true RCW 13.34.020 recognizes the importance of the "family unit". However, neither the Department nor the father cites support for the proposition that a child's "family unit" must be interpreted to include a biological father who left the child when the child was 2 months old, and who, at the time of the Department's decision to contact him, had done nothing whatsoever to establish a relationship with the child or to assure the child's basic support in any way.[5]

---

boldface ours.) Evaluation by Glen Frese, Psy.D., Clinical Psychologist. Petitioner's Motion for Discretionary Review app. 8.

[5]The significance of the father's absence from the child's life was noted by the Superior Court: "[T]he foster parents' home [*sic*] and over the length of time couldn't have been more appropriate and *I find great difficulty in removing the child from their home but it seems to me that the Court's obligation is to provide this father with an opportunity. . . .* I have here a father who participated in the [procreation] of his child, who had left early in the relationship and then was incarcerated for a drug violation over a long period of time. Upon release he is deported and he returns to the United States in violation of the immigration law. *Possibly those considerations in and amongst themselves would be enough to sustain termination. I don't know. However, if the termination had been filed early in 1992 I think it probably would have* but once contact was made it seems to me that the consistency of the father in attempting to establish his relationship—his attempting to reintegrate into the life of this child, that has been exemplary in that *he deserves an opportunity to provide a home for [J.B.S.].*" (Italics ours.) Report of Proceedings (Dec. 1, 1992), at 12-13.

Even if the Department's efforts have now resulted in making the father a part of J.B.S.'s family unit, a question we leave to the trial court, it does not follow that this fact *compels* placement with the biological father. The statute and case law establish that, to the extent a parent's rights conflict with the child's, the *child*'s best interests should be paramount. Because the Superior Court did not apply this standard, we reverse its decision.

To provide guidance in this case should the Department file a new motion for a change of placement, we now turn to a discussion of considerations the trial court should carefully evaluate in making a placement decision. These include the psychological and emotional bonds that exist between J.B.S. and his mother, between J.B.S. and his siblings, and between J.B.S. and his foster family; the potential harm he would suffer if effectively severed from contact with these persons; and the effect of placement in a foreign country on the court's ability to oversee the placement. The court should also consider the mother's present circumstances, including her *present* ability to provide J.B.S. a good home.

In addition, the court should evaluate the nature of J.B.S.'s attachment to his biological father; the father's history and present circumstances; the home available to J.B.S. in Mexico; and the potential effect upon J.B.S. of an abrupt and substantial change in his environment.

The trial court has discretion to consider these and other factors that may affect the child's well-being, including, but not limited to, the guardian ad litem's concerns. Of course, none of these considerations is in itself dispositive. This is a highly fact-specific inquiry that cannot be reduced to a mathematical equation. *See In re Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980); *see also In re Becker*, 87 Wn.2d 470, 477, 553 P.2d 1339 (1976); *cf. McDaniels v. Carlson*, 108 Wn.2d 299, 312, 738 P.2d 254 (1987).

The father correctly argues that his criminal history does not in and of itself disqualify him from having J.B.S. placed with him. It is, however, a relevant consideration,

insofar as it may reflect parental fitness and affect the child's welfare. The trial court may also consider such factors as the seriousness of the crime, the identity of the victim, the parent's conduct before and during incarceration, and the parent's overall regard for parental obligations, including any financial support of the child. *See In re Pawling*, 101 Wn.2d 392, 397-98, 679 P.2d 916 (1984); *see also In re Sego*, 82 Wn.2d 736, 740, 513 P.2d 831 (1973).

■ Along the same lines, amici argue that immigration status by itself should not be a dispositive consideration. The same reasoning that applies to criminal history extends to immigration status as well. Although not dispositive, the trial court has discretion to consider this factor, insofar as it may affect the consequences of the placement decision.

The fact the child's interests should prevail does not mean the rights and interests of the natural parents have no weight, only that these rights are not paramount. This court has repeatedly emphasized that parents have a fundamental liberty and privacy interest in the care and custody of their children. *See In re J.H.*, 117 Wn.2d 460, 473, 815 P.2d 1380 (1991); *see also In re Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972); *Meyer v. Nebraska*, 262 U.S. 390, 399, 67 L. Ed. 1042, 43 S. Ct. 625, 29 A.L.R. 1446 (1923); *In re Myricks*, 85 Wn.2d 252, 253-54, 533 P.2d 841 (1975)).

■ Finally, in making its placement decision, the trial court must be mindful of the statutory scheme, and particularly of the legislative preference for placements that least disrupt a child's attachments and sense of stability. Thus, the Legislature has directed the court to adopt a program which will "least interfere with family autonomy, provided that the services are adequate to protect the child." RCW 13.34.130(1)(a). *See also* RCW 13.34.130(3)(b)(iii). This court has echoed similar concerns, admonishing that "multiple changes in custody as a result of judicial proceedings are to be avoided if this is possible without harm to the child", *In re Aschauer*, 93 Wn.2d at 695, indicating that "continuity of

established relationships is a key consideration", *Mc-Daniels*, 108 Wn.2d at 312.

Child development experts widely stress the importance of stability and predictability in parent/child relationships, even where the parent figure is not the natural parent.

*McDaniels*, 108 Wn.2d at 310; *see, e.g.,* Joseph Goldstein, Anna Freud & Albert J. Solnit, *Beyond the Best Interests of the Child* (1979).

For the reasons set forth above, we reverse the Superior Court's decision to uphold the commissioner's decision to place the child in Mexico.

## II

### REQUIREMENT OF A REVIEW HEARING

The mother also contends the trial court erred in failing to conduct a review hearing every 6 months as required by RCW 13.34.130(5). That provision requires the status of all dependent children be reviewed at least every 6 months to determine whether court supervision should continue. *See* RCW 13.34.130(5).

The record contains no evidence of a review hearing after May 21, 1992. The Department contends the findings entered pursuant to the order denying the motion for revision fulfilled the requirement of a review hearing. See Brief of Respondent Department, at 33-35. We disagree.

Review hearings are designed to focus on the question of the child's dependency status. *See In re Chubb*, 112 Wn.2d 719, 726, 773 P.2d 851 (1989). If the child is not returned home, the Legislature has directed the court to make specific findings:

(i) Whether reasonable services have been provided to or offered to the parties to facilitate reunion, specifying the services provided or offered;

(ii) Whether the child has been placed in the least-restrictive setting appropriate to the child's needs, including whether consideration has been given to placement with the child's relatives;

(iii) Whether there is a continuing need for placement and whether the placement is appropriate;

(iv) Whether there has been compliance with the case plan by the child, the child's parents, and the agency supervising the placement;

(v) Whether progress has been made toward correcting the problems that necessitated the child's placement in out-of-home care;

(vi) Whether the parents have visited the child and any reasons why visitation has not occurred or has been infrequent;

(vii) Whether additional services are needed to facilitate the return of the child to the child's parents; if so, the court shall order that reasonable services be offered specifying such services; and

(viii) The projected date by which the child will be returned home or other permanent plan of care will be implemented.

RCW 13.34.130(5)(b).

■ The fact the trial court may have addressed some of these matters explicitly or implicitly in deciding the motion for a change of placement does not transform those proceedings into the statutorily mandated review hearing. Most notably, the trial court did not adequately discuss the question, required under RCW 13.34.130(5)(b)(ii), whether the plan to send J.B.S. to Mexico was the least restrictive alternative available in this case.

We reverse the Superior Court and remand for a review hearing pursuant to RCW 13.34.130(5) to determine whether the mother's present circumstances warrant a reconsideration of the child's dependency status. If, after that hearing, the Department still wishes to make a motion to change placement, it can do so at that time. Any such motion should be evaluated by the trial court in a manner consistent with this opinion.

ANDERSEN, C.J., AND BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, JOHNSON, AND MADSEN, JJ., concur.