[No. 66873-1-I.   Division One.   February 6, 2012.]

*In the Matter of the Dependency of* M.R.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*, v. CARISSA PAULOS, *Petitioner*.

*Christopher Gibson* and *David B. Koch* (of *Nielsen, Broman & Koch PLLC*), for petitioner.

*Robert M. McKenna, Attorney General,* and *Mary Ann McIntosh, Senior Counsel,* for respondent.

¶1 SCHINDLER, J. — After Carissa Paulos entered into an agreed order of dependency, the court entered an order placing her four-year-old daughter with the paternal grandparents. At the first dependency review hearing, the court removed M.R. from the care of her paternal grandparents based solely on the court's unfounded concerns about their immigration status. Because the decision to remove M.R. from the care of her paternal grandparents was based on untenable grounds and contrary to law, we reverse.

## FACTS

¶2 M.R. was born on June 1, 2007. Carissa Paulos is M.R.'s mother and Erik Rios-Jimenez is the child's father.

In October 2010, Child Protective Services (CPS) learned that Paulos was using drugs and had left M.R. with the paternal grandparents.

¶3 The paternal grandparents told the CPS investigator that Paulos was engaged in prostitution to support her drug habit and had not taken care of M.R. for the past four to five months. The grandmother showed the CPS investigator a text message from Paulos stating that "she could not take care of the child and the Paternal Grandmother could take the child."

¶4 When the CPS investigator contacted Paulos, she admitted using methamphetamines and "reported she cannot care for the child at this time as she is homeless." Following an investigation and background check, the Department of Social and Health Services (Department) placed M.R. with the paternal grandparents.

*Dependency Petition*

¶5 On November 10, the Department filed an amended dependency petition. The petition alleged M.R. was abused or neglected, as defined in chapter 26.44 RCW, and had no parent capable of adequately caring for the child. The Department requested entry of a dependency order "due to neglect and maltreatment." The petition alleged, in pertinent part:

> The alleged father is not available to parent as he has been deported to Mexico due to criminal activity. The mother is not available to parent as she is using methamphetamines, does not have safe stable housing, admitted to the relatives and CPS investigator that she is not capable of caring for the child at this time, has left the child with various relatives, is prostituting herself and has possibly prostituted in front of the child. The Department and the child's maternal and paternal family believe this child is at imminent risk of harm if left in the mother's care. The Department is recommending out of home placement at this time as there is no parent capable of caring for the child.

¶6 The court scheduled a preliminary hearing for November 23, and a fact-finding hearing on the dependency petition for December 23. Prior to the preliminary hearing, the Department submitted an "Individual Service and Safety Plan" (ISSP) and the declaration of the department social worker assigned to the case, Andy Duarte.

¶7 In the ISSP, the Department recommended that M.R. "remain in out of home placement and that dependency be established with a primary plan of return home and a secondary plan of adoption." In his declaration, Duarte states that the "Department is making a referral to initiate the relative home study process and has found that the paternal relative placement meets the needs of the child and provides a loving and caring environment for her." Duarte also states that placing M.R. with the paternal grandparents will ensure "the needs of the child are being met."

¶8 Duarte's declaration describes the strong bond between M.R. and the paternal grandparents, and states that the mother wants "the child to stay with the paternal grandparents as she believes this is a caring and loving home." The declaration states, in pertinent part:

> The home of the parental [sic] grandparents consists of the grandmother and grandfather and their two sons, ages 12 and 17. Due to the nature and culture of the family, multiple aunts, uncles, and cousins visit the home which gives the child opportunity to see multiple family members. The child has also had opportunities to visit with her half brother that lives in the area. The siblings share the same father. A health and safety visit was conducted on 11/17/2010 at the home of the paternal grandparent's [sic] home. There were no concerns about the safety and well being of the child in the home. The placement is ensuring that all of the needs of the child are being met. The bond between the child and the paternal grandparents was observable. According to the mother and the paternal grandmother, the child has spent time living in the home off and on since birth. The placement has also demonstrated that they will follow the Department's recommendations in reference to visitation for the mother.

¶9 Duarte also described threats to contact the immigration authorities made by the mother's family if the Department placed the child with the paternal grandparents.

> Allegations were made against the paternal family side after the child was taken in to CPS custody. There were several indications that the immigration authorities were going to be called on the paternal grandparents if the child was placed with them. While it was not clear to this social worker who made the threats, this social worker, along with the CPS social worker saw text messages sent to the paternal grandmother indicating that on October 26 2010, at 0851am, " . . . my family called immigration to come to court to and fingerprint you, they are crazy." On 11/18/2010, this social worker asked the mother about this text message and she states that this was a threat made by her "aunt", and that she was confused about the whole placement situation. She went on to say that her family continues to pressure her to choose that the child stay with the maternal family. She reported that she is told she will get free housing, money and anything she asks for if she can get the courts or the Department to change the placement.

¶10 In the declaration, Duarte also states that based on concerns regarding immigration status of the paternal grandparents, the Department conducted an expedited background check and the area administrator conducted a review before approving placement of M.R. with the paternal grandparents. The declaration states, in pertinent part:

> On 10/21/2010, the child was placed with her paternal grandparents. An expedited NCIC [(National Crime Information Center)] background check was completed as well as a BCCU [(Background Check Central Unit)] background check for the two adults in the home. The results indicated there were no disqualifications for placement for the child. The paternal grandmother indicated to the CPS social worker that she was not able to be a long term placement option due to receiving a threat via text mess[a]ge from a maternal relative. The relative threatened to call immigration if the paternal relative did not drop the child off at the maternal relative's house. The CPS social worker did obtain approval from the Area Administrator

to place the child in the paternal grandmother's home. At that time, the mother also indicated that she supported the placement of her child in the home of the paternal grandparents. Before the CPS intervention, the mother had voluntarily placed her child with the paternal grandparents.

*Agreed Order of Dependency*

¶11 Before the fact-finding hearing scheduled for December 23, Paulos entered into an agreed order of dependency. At the December 14 disposition hearing, the court found M.R. dependent and entered an order stating that the child shall remain in relative placement with the paternal grandparents. The order also gives Paulos liberal supervised visitation and allows unsupervised visitation if approved by the volunteer guardian ad litem (VGAL) and the Department. The court scheduled the first dependency review hearing for February 17, 2011.

*Dependency Review Hearing*

¶12 Before the February 17 review hearing, the Department filed a second ISSP. The ISSP recommends returning M.R. to the mother as the primary permanency plan with an alternative plan of adoption by the paternal grandparents. In the meantime, the Department asked the court to maintain the placement of M.R. with the paternal grandparents. VGAL Michele Wagner also recommended that the child remain with the paternal grandmother.

¶13 The ISSP describes M.R.'s strong bond with the paternal grandmother and ongoing concerns about "behaviors that indicate she has difficulty trusting adults, being abandoned by caregivers, and knowing the language to express her feelings." In addition, the ISSP describes the child's distress when separated from the paternal grandmother but also the marked improvement observed by the caretakers at day care.

[M.R.]'s day care reports that [M.R.] is doing so much better socially with other students. At the beginning she expressed

her shyness but after exposing her to smaller groups of peers, she is adapting so much better. [M.R.] is always happy to see her grandmother and there are no concerns with the caregiver. Initially she would cry when the caregiver would drop her off but she would immediately stop crying when the caregiver would leave. She is learning letters, numbers, and colors and there doesn't appear to be any cognitive or learning concerns or issues.

¶14 The mother opposed the Department's proposed permanency "plan of return home and adoption." Paulos took the position that the permanency plan should not include the alternative of adoption. The court entered an order continuing the dependency review hearing from February 17 to March 10.

¶15 On February 24, Paulos wrote a letter to the court. Paulos said that she was "willing to do whatever I have to do to get [M.R.] back" and asked the court to change the placement of M.R. from the paternal grandparents to her relatives.

¶16 Before the March 10 hearing, Duarte filed a declaration in "response to the court's request for information regarding the child's placement with a person alleged to be undocumented." Duarte explains that while the Department does not determine immigration status, the Department took the alleged undocumented status of the paternal grandparents into consideration in making the determination that placement with the paternal grandparents was in the child's best interests.

> Children's Administration (CA) has the responsibility to investigate relatives for character, suitability, and competence in the care and treatment of children prior to placement of a child with a relative. . . .
>
> [M.R.] has remained in the care of her current caregivers, [A.J.] and [W.R.], since her mother left her at this residence in early October 2010 after taking her from the maternal grandparents' home. The child has now been in this home for 5 months.

[A.J.] and [W.R.] own their home and have been residing in the same residence for 6 years. They are both employed full time. For the last 3 years, [A.J.] has been the owner of a cleaning service, and prior to that worked for 10 years for another cleaning company. [W.R.] has been employed as an asbestos extractor for 10 years. They have two children ages, 12 and 15. Both children attend school regularly and there have been no concerns about their attendance or behaviors. There is no CPS intake history.

. . . .

. . . The Department does have legal authority to approve an adoption home study of an undocumented individual and to consent to the adoption of a child in [Department] custody by an undocumented individual. The immigration status of a prospective adoptive parent (and the potential consequences of the status) is a factor that should be considered in approving a home or placing a child, but undocumented status alone[ ] is not a reason to disqualify a placement. Additionally, it is not a reason to refuse to license a foster parent or to refuse placement with a relative.

Duarte also reiterated that removing M.R. from placement with the paternal grandparents would be detrimental to the child because of her strong bond with the paternal grandparents, and because she had adjusted so well to day care.

¶17 In a February 10 addendum to the VGAL report submitted by the VGAL program coordinator, Jaime Peniche, the VGAL recommended that the child "remain in her current relative care Placement with the paternal grandmother." The addendum also addressed "[p]lacement of [M.R.] with an undocumented relative." The addendum states that the paternal grandmother has been in the country for 18 years and the paternal grandfather has been in the country for 17 years. While deportation was a concern, the VGAL states that changing M.R.'s placement with the paternal grandparents would be detrimental to M.R. "[M.R.] has experienced a great deal of instability in her life due to the comings and goings of her mother and father and the VGAL is concerned about the effect of yet

another change in placement would have on this child." The VGAL states that the paternal grandmother "is providing for [M.R.'s] needs" and M.R. is "content and adjusted" at the grandparents' home.

> She has her own bedroom and appropriate toys and clothing. They have a pet squirrel, a dog, as well as chickens for eggs and food and [M.R.] helps feed the animals. [M.R.] attends daycare twice a week and is now enrolled in a bilingual Head Start program. [A.J.] has her husband, other family members, friends, and her church for support and both [A.J.] and her husband are employed. [A.J.] wants [M.R.] to learn Spanish and makes efforts to only speak with her in Spanish unless [M.R.] is not able to understand what is being said.

¶18 The attorney for the Department, the VGAL program coordinator, the attorney for the VGAL, and Paulos and her attorney were present at the March 10 dependency review hearing. The Department, the VGAL, and the mother agreed that it was in the child's best interest to remain with the paternal grandparents.

¶19 However, the attorney for the mother argued that because Paulos was successfully engaged in drug and alcohol treatment, the court should adopt a permanency plan of returning the child to the mother. The Department argued that the court should adopt a concurrent permanency plan of returning the child to the mother while at the same time pursuing adoption. The court agreed with the Department.

> I agree with the Department on this. It's good that she is now getting into treatment. I'm glad. Her start has been a little late.
>
> Ma'am, your work is cut out for you. It's time to get going on it. And I appreciate that you are underway on part of it, and I will encourage you to continue to do what you need to do. In the meantime I'm approving a concurrent plan. I think that takes into account that you are now engaging in services to an extent, but the clock is ticking.

¶20 The judge then questioned whether the mother still agreed with the recommendation that M.R. should remain

with the paternal grandparents based on the letter the mother sent to the court.

All right. Well, this must be my question today to you, because I remember very well that she took a completely different position last time and that was taken into account, I'm sure, by the Department. She wanted the child placed with the paternal family before and the child was. I'm sure that was partly because she wanted it that way, and a parent's input is considered.

Now she's taken a different view. Obviously, we have all seen in her letter, she wants the child placed with the maternal family. And oftentimes when people change their minds very suddenly it means that their view should be given a little less weight because it is — I mean no disrespect, ma'am, but oftentimes it means that they are just a little bit flighty and therefore it is hard to assess how much weight to give their viewpoint, because if it changed once, it might change again.

¶21 The mother said that her family pressured her to write the letter. The mother unequivocally told the court that she wanted M.R. to stay with the paternal grandparents.

MS. PA[U]LOS: I really want my daughter where she is, with the paternal grandparents.

THE COURT: Okay. So this morning you are telling me you want your daughter with the paternal family?

MS. PA[U]LOS: That's where I've always wanted her to be.

THE COURT: Okay. Did you want that when you wrote this letter? I'm referring now to the letter that was filed on the 25th signed by you apparently on the 17th, which said something different. Why don't you tell me about that letter.

MS. PA[U]LOS: The letter I sent?

THE COURT: On the 17th, the one you signed on the 17th. I'm supposed to take into account your view, but your view seems to have changed and that's why I'm asking you to explain it.

MS. PA[U]LOS: Yeah, because I was using and I felt pressured by my family, so. I really —

THE COURT: What pressure did you receive from your family?

MS. PA[U]LOS: What was that?

THE COURT: What pressure did you receive from your family?

MS. PA[U]LOS: Well, that my daughter should be placed on my side and not the paternal side, they were against it.

¶22 After ascertaining that the mother wanted the child to remain with the paternal grandparents, the court addressed its concern about the undocumented status of the paternal grandparents.

All right. Now, last time we were here I learned, thanks to the guardian ad litem, that everyone except myself seemed to already understand and take for granted that the placement was — was one of undocumented status. In other words, the paternal grandparents were undocumented aliens. This came as something of a surprise to me, because I specifically remember a time when the Department was taking the view that the maternal family had made threats of this sort, which I thought had been characterized as spurious and unfair or something, and yet it was not drawn to my attention that in fact there may well be some substance to it. And when I inquired as to whether or not the Department had indeed placed the child with an illegal alien or two, I was told no, that I[,] the Court[,] had. And when I inquired as to when the Department was going to tell me this, I was told that the Department had told me this.

¶23 In response, the attorney for the Department pointed out that the declaration that Duarte submitted to the court in November 2010 addressed the immigration status of the paternal grandparents and the threats made by the mother's family. The attorney argued that while immigration status is a factor the court could consider in making the placement decision, a recent Washington State Supreme Court case emphasized that "undocumented status is not a reliable indication of risk of deportation."

¶24 The VGAL attorney also pointed out that the paternal grandparents had lived in the United States for 18 years

and the "child is stable in this home [and] is doing well. The child has been there for five or six months. It's certainly a culturally appropriate home, from the standpoint that the child is learning to speak Spanish." The attorney told the court that the VGAL took the position that "it's not in the child's best interest" to change the placement.

¶25 Despite the position of the Department, the VGAL, and the mother that it was in the best interest of the child to remain with the paternal grandparents, the court ordered M.R. removed from the placement with the paternal grandparents. The decision to remove M.R. was based solely on the court's admittedly unsubstantiated concerns about immigration status. The court's oral ruling states, in pertinent part:

> I have no doubt that she is in a good home. I have no doubt that her grandparents are taking care of her. I have no doubt that they are doing all the right things. . . .
>
> . . . .
>
> . . . [I]t is my job to determine whether or not [M.R.] is in what I would consider the best — or maybe a stable or unstable situation for her. . . .
>
> I appreciate that frequently people are in the United States illegally for a very long time and never draw the attention of the authorities, and that that has historically been the case and I accept that from the Department. One also hears from time to time that . . . this administration is deporting people much faster than the last one. I don't know what to make of that, and I am not going to make anything out of it. I think the only thing I can really say is it's uncertain and I don't think anybody can say what's going to happen. Maybe they will be here for the rest of their lives and be happy productive members of society here, even though they are not legal citizens, if that's the case, but I don't really know they are not legal citizens, because that investigation has not really been done. We are all just assuming.
>
> But on the other hand, I have no assurances that it's stable and that is the big problem here. Because if I leave that child

here and then we all turn out to be wrong and we just took a bad risk, then guess what, [M.R.] is going to be torn from that home and it will be more traumatic then in the future than it is now, and nobody seems to take the position that that's not true. . . .

. . . .

And I don't agree that it is worth the risk to leave [M.R.] in a home that could simply evaporate overnight for all we know and we can all hope that doesn't happen, but we have no assurances. Nobody has done anything to present any assurances today that that won't happen.

¶26 The order entered by the court states that the permanency plan is to return M.R. to the mother or adoption. The order removes M.R. from placement with the paternal grandparents and states that the child should be placed with relatives or in foster care. The order states, in pertinent part:

The child is not in an appropriate placement that adequately meets all his or her physical, emotional, cultural, and educational needs and the court removes the child from the paternal relatives, but does so with a transition period that allows the child time to transition out of the paternal relatives['] care.

*Discretionary Review*

¶27 Paulos filed a motion for discretionary review of the decision to remove M.R. from placement with the paternal grandparents. Paulos argued that under RAP 2.3(b)(2), the court committed probable error that altered the status quo. We granted discretionary review and scheduled the case for expedited review and hearing.

## ANALYSIS

¶28 Paulos contends the court abused its discretion by removing M.R. from the placement with her paternal grandparents based solely on unfounded assumptions concerning their immigration status. Paulos asserts that be-

cause the decision is based on untenable grounds, as well as contrary to law and the best interests of M.R., the court abused its discretion in ordering the child to be removed from the care of her paternal grandparents.

¶29 The decision of the juvenile court to change the placement of a child in a dependency proceeding is reviewed for abuse of discretion. *In re Dependency of A.C.*, 74 Wn. App. 271, 275, 873 P.2d 535 (1994). A court abuses its discretion if the decision is manifestly unreasonable, or based on untenable grounds or untenable reasons. *In re Dependency of T.L.G.*, 139 Wn. App. 1, 15, 156 P.3d 222 (2007). A decision is manifestly unreasonable if "it is outside the range of acceptable choices, given the facts and the applicable legal standard or if the facts do not meet the requirements of the correct standard." *T.L.G.*, 139 Wn. App. at 15-16.

¶30 In determining placement of a child in a dependency proceeding, the court's paramount duty is to protect the best interests of the child. RCW 13.34.020;[1] *In re Dependency of J.B.S.*, 123 Wn.2d 1, 10, 863 P.2d 1344 (1993). The best interest of the child is "a highly fact-specific inquiry that cannot be reduced to a mathematical equation." *J.B.S.*, 123 Wn.2d at 11; *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

¶31 In *J.B.S.*, our Supreme Court identified a number of factors that the court should take into consideration and "carefully evaluate in making a placement decision." *J.B.S.*, 123 Wn.2d at 11. These factors include the

---

[1] RCW 13.34.020 provides:

The legislature declares that the family unit is a fundamental resource of American life which should be nurtured. Toward the continuance of this principle, the legislature declares that the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized. When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail. In making reasonable efforts under this chapter, the child's health and safety shall be the paramount concern. The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter.

nature of the child's attachment to siblings and the caregiver; the psychological and emotional bond that exists between the dependent child and the parents, siblings, and caregivers; and the potential harm the child may suffer "if effectively severed from contact with these persons." *J.B.S.*, 123 Wn.2d at 11. The court must also evaluate the potential effect on the child of an abrupt and substantial change in the child's environment. *J.B.S.*, 123 Wn.2d at 11. In *J.B.S.*, the court states that although immigration status alone is not a dispositive factor in making a placement decision, the juvenile court "has discretion to consider this factor, insofar as it may affect the consequences of the placement decision." *J.B.S.*, 123 Wn.2d at 12; *see also Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 669, 230 P.3d 583 (2010) (immigration status alone is not a reliable indicator of whether someone will be deported—"[b]ased solely on his immigration status, the risk of Salas' being deported is exceptionally low").

¶32 A significant factor to consider is the need to maintain "continuity in the parent-child relationship," regardless of whether the parent figure is the paternal parent. *Aschauer*, 93 Wn.2d at 695. Accordingly, "multiple changes in custody as a result of judicial proceedings" are to be avoided if this is possible without harm to the child. *Aschauer*, 93 Wn.2d at 695. The court must also take into consideration "the legislative preference for placements that least disrupt a child's attachments and sense of stability." *J.B.S.*, 123 Wn.2d at 12.

¶33 Here, the uncontroverted record shows that M.R. had a strong psychological and emotional bond with her paternal grandmother, the paternal grandparents fostered M.R.'s relationship with her mother and half-sibling, and M.R. was doing well in the day care program.

> [M.R.] has a paternal half sibling. The Department is required to consider sibling connection when making placement decisions. The paternal grandparents have a relationship with the half-sibling's family. The paternal grandparents have stated a

willingness to maintain the sibling relationship and are in contact with the half-sibling's family.

The record also established that removing M.R. from the placement with her paternal grandparents would be detrimental to M.R.:

It would be detrimental to [M.R.]'s welfare for her to be moved to another placement as [she] is participating in Head Start and also attends a child care facility where she has made an excellent adjustment, has developed friendships, and her social skills have reportedly improved. The paternal grandmother has a good relationship with these service providers and the child care facility has reported to social worker [that M.R.] appears very bonded to her paternal grandmother and the paternal grandmother is very consistent and involved. . . .

. . . On 03/02/2011, social worker contacted the child's day care provider and she provided the following report: The child is doing extremely well in the day care and she has gone from being very quiet and "shy" to now participating in her small groups and is a pleasure to be in the day care. She is thriving in the small milieu and doesn't get as overwhelmed as she did initially. The director reports she has seen nothing but caring and loving interactions with the paternal grandmother and reports that she knows that the child is well taken care of as the paternal grandmother picks the child up midday, 4 times a week, to take the [sic] her to HeadStart. She lastly stated that removing the child from the day care and the school she loves, not to mention the placement with the paternal grandmother[,] would be "traumatic." The Department requested the child care provider provide a written report; however, this report has not been received to date.

We conclude that the decision to remove M.R. from the placement with her paternal grandparents was not only based on untenable grounds, it was also contrary to law.

¶34 The dependency statute recognizes the need "for stability and permanence in a dependant child's living arrangements." *In re Dependency of R.L.*, 123 Wn. App. 215, 224, 98 P.3d 75 (2004). Accordingly, any change in the

placement of a child must be supported by proof of a change in circumstances. RCW 13.34.150 provides:

> Any order made by the court in the case of a dependent child may be changed, modified, or set aside, only upon a showing of a change in circumstance or as provided in RCW 13.34.120.[2]

¶35 Here, there was no showing of a change of circumstances. The record shows that the paternal grandparents took care of M.R. for several months before the Department conducted an investigation and placed the child with the paternal grandparents in October 2010. Following entry of the dependency order in December 2010, the court entered an order placing M.R. with her paternal grandmother. At the first dependency review hearing on March 10, 2011, the Department, the VGAL, and the mother told the court that continuing placement of M.R. with the paternal grandparents was in the best interests of M.R., and provided documentation supporting the agreed recommendation.

¶36 Because the decision to remove M.R. from placement with the paternal grandparents was based on untenable grounds and was contrary to law, we reverse the decision to remove M.R. from the care of her paternal grandparents, and remand.

GROSSE and BECKER, JJ., concur.

---

[2] RCW 13.34.120 is inapplicable here. RCW 13.34.120 addresses entry of a disposition order following the establishment of a dependency.