# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

In the Matter of the Dependency of

J.P.W., d.o.b. 09/18/00,

                    A Minor Child.

KARREN WALBERG,

                    Appellant,

v.

STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

                    Respondent.

No. 69113-9-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: April 29, 2013

LEACH, C.J. — Karren Walberg appeals a dispositional order limiting visitation with her child, J.P.W., to two hours of supervised visitation per week. Walberg claims that the trial court erred in restricting the visitation without an express finding that limited visitation was necessary to protect the child's health, safety, or welfare. She also contends that the Department of Social and Health Services (DSHS) failed to rely upon community resources to provide additional visitation. Because the evidence supports the conclusion that increased visitation would be harmful to J.P.W. and because DSHS considered community

resources but determined that additional visitation supervised by the foster parent was not in J.P.W.'s best interest, we affirm.

Background

J.P.W. was born on September 18, 2000. He was the subject of a 2001 dependency case, which was dismissed in 2003. Allegations in the 2001 dependency action included neglect due to substance abuse and mental health issues. DSHS filed a second dependency petition in 2012 based upon Walberg's continuing substance abuse and mental health issues.

When J.P.W. entered protective custody in 2012, Walberg did not have stable housing. Although she had a section 8 housing voucher, Walberg relinquished her apartment at the end of 2011 because she wanted to find a house with a yard for J.P.W. Between December 2011 and February 2012, Walberg and J.P.W. stayed either with friends or in a motel.

In late February 2012, Walberg and J.P.W. were staying with an individual named Maria. On the evening of February 23, 2012, Maria informed Walberg that she and J.P.W. were no longer welcome. While Maria permitted J.P.W. to stay that night, she made Walberg leave. Walberg stayed at another friend's home and returned the next morning to collect J.P.W. and her belongings. She sent J.P.W. to school on the bus. Maria also left home, telling Walberg to come back in an hour if she wanted to collect her belongings. When Walberg came back, there was no one at Maria's house. While waiting for Maria, Walberg fell

asleep on Maria's porch. At 2:45 p.m., she was awakened by a phone call from the school informing her that J.P.W. could not take his usual bus home.

When she woke up, Walberg could not move her arm and noticed that her purse and other belongings were missing. Suspecting her arm was broken and her belongings stolen, Walberg asked the school to call the police and an ambulance for her. Emergency personnel determined that Walberg's arm was not broken and asked if she wanted to go to the hospital. She declined because she needed to go pick up J.P.W. from school. After brief treatment, Walberg walked to the school. A deputy located Walberg and approached her to ask her some questions. During questioning, the deputy realized that Walberg could not converse rationally. Walberg became extremely agitated and refused to give the deputy her name. This situation continued after Walberg and the deputy arrived at the school and lasted approximately an hour. As the deputy tried to talk with Walberg about J.P.W., she became more enraged, to the point that she began to make threats against the school. The officer handcuffed Walberg and placed her in the back of his patrol car. A sheriff's deputy later transported Walberg to the hospital to be evaluated for involuntary commitment.

DSHS filed a dependency petition on February 28, 2012. The court held a shelter care hearing on February 29. At this hearing, Walberg contested DSHS's recommendation for out-of-home placement. The court ordered J.P.W. be placed with Shannon Smith, an acquaintance, who had previously provided Walberg and J.P.W. with a place to stay. Although Smith provided housing and

food for Walberg and J.P.W., she no longer wished to monitor visits for Walberg once the court placed J.P.W. in protective custody. The court also ordered DSHS to provide Walberg and J.P.W. a minimum of two hours of monitored visitation per week.

On June 12, 2012, the court entered an order of dependency. In its order, the court found that DSHS had established by a preponderance of the evidence that J.P.W. had no parent, guardian, or custodian capable of adequately caring for him. The court specifically found that J.P.W.'s psychological or physical development was in danger of substantial damage. Although Walberg did not believe that her mental health issues affected her relationship with J.P.W., she admitted that in a previous psychological evaluation, she received a diagnosis of paranoid personality, antisocial personality disorder, dependent personality disorder, and substance abuse issues. The court also found that Walberg used methamphetamine in the past and was currently using marijuana without a medical prescription.

Despite DSHS's request for decreased visitation, the court retained two hours of supervised visitation per week. In its order, the court expressed concern that "piling more rules on top" of Walberg who already had "antipathy" toward DSHS would make Walberg's visitation with J.P.W. more difficult. The court ordered DSHS to clarify the standard visitation rules. However, the court denied Walberg's request to make up for past times when her visit was limited to one hour because of J.P.W.'s school schedule.

Walberg failed to timely appeal the court's disposition order regarding her visitation with J.P.W. Later, Walberg filed a motion to extend time to file her notice of appeal. This court's commissioner passed this motion to the panel for decision.

## Standard of Review

Juvenile courts have broad discretion in matters dealing with children's welfare.[1] We will not disturb a juvenile court's determination involving visitation rights on appeal unless the court abused its discretion.[2] A trial court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds.[3] A trial court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard.[4] A decision is based on untenable grounds or for untenable reasons if the trial court applies the wrong legal standard or relies on unsupported facts.[5]

Walberg does not challenge any of the trial court's findings of fact. Unchallenged findings of fact are verities on appeal.[6]

## Analysis

RAP 5.2(a) requires filing a notice of appeal within 30 days of the trial court's entry of the judgment. An appellate court will extend the time within which a party must file a notice of appeal only in extraordinary circumstances and to

---

[1] In re Dependency of T.L.G., 139 Wn. App. 1, 15, 156 P.3d 222 (2007).
[2] T.L.G., 139 Wn. App. at 15.
[3] State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).
[4] Rohrich, 149 Wn.2d at 654.
[5] Rohrich, 149 Wn.2d at 654.
[6] In re Dependency of P.D., 58 Wn. App. 18, 30, 792 P.2d 159 (1990).

prevent a gross miscarriage of justice.[7] Extraordinary circumstances exist when "the filing, despite reasonable diligence, was defective due to excusable error or circumstances beyond the party's control."[8] The court must balance the strict application of filing deadlines against the constitutional right to appeal.[9] In Washington, parents have a guaranteed right to appeal a dispositional order following a dependency determination[10] and the right to counsel for that appeal.[11]

Walberg asks us to extend the time to file her notice of appeal, alleging that she was denied effective assistance of counsel when her appointed counsel failed to timely appeal. Because the trial court entered the disposition order on June 21, 2012, she had to file a notice of appeal by July 23. Walberg's trial counsel withdrew on June 21, 2012, and a new counsel was not appointed until June 29, 2012. During that time, Walberg intended to appeal the dispositional order and believed that the notice of appeal was timely filed. Walberg's new counsel filed the notice of appeal on July 31, 2012. Where, as here, the party does not voluntarily and knowingly waive the right to appeal and the failure to timely appeal was beyond the party's control, the court may allow an extension to prevent a gross miscarriage of justice. We grant the extension and decide the merits of the case.

---

[7] RAP 18.8(b).
[8] Reichelt v. Raymark Indus., Inc., 52 Wn. App. 763, 765, 764 P.2d 653 (1988).
[9] State v. Kells, 134 Wn.2d 309, 314, 949 P.2d 818 (1998).
[10] RAP 2.2(a)(5).
[11] RCW 13.34.090; In re Dependency of Grove, 127 Wn.2d 221, 226-27, 897 P.2d 1252 (1995).

Visitation is crucial to reunifying families, and the legislature has recognized its importance in RCW 13.34.136(2)(b)(ii).[12] This statute requires that DSHS encourage maximum family contact when such contact is in a child's best interest.[13] Visitation may be limited or denied only if the court determines that the limitation or denial is necessary to protect the child's health, safety, or welfare.[14] An express finding of harm is not required if the evidence supports the conclusion that visitation is harmful to the child.[15] However, the harm must be "an actual risk, not speculation based on reports."[16] Further, DSHS bears the burden of proving that visitation poses a current concrete risk to the child.[17]

Here, the court made a specific finding that returning J.P.W. to Walberg before she completed psychological, alcohol, and drug evaluations and drug

---

[12] RCW 13.34.136(2)(b)(ii) provides:
Visitation is the right of the family, including the child and the parent, in cases in which visitation is in the best interest of the child. Early, consistent, and frequent visitation is crucial for maintaining parent-child relationships and making it possible for parents and children to safely reunify. The supervising agency or department shall encourage the maximum parent and child and sibling contact possible, when it is in the best interest of the child, including regular visitation and participation by the parents in the care of the child while the child is in placement. Visitation shall not be limited as a sanction for a parent's failure to comply with court orders or services where the health, safety, or welfare of the child is not at risk as a result of the visitation. Visitation may be limited or denied only if the court determines that such limitation or denial is necessary to protect the child's health, safety, or welfare.
[13] RCW 13.34.136(2)(b)(ii).
[14] RCW 13.34.136(2)(b)(ii).
[15] In re Dependency of T.H., 139 Wn. App. 784, 794, 162 P.3d 1141 (2007).
[16] T.L.G., 139 Wn. App. at 17.
[17] T.L.G., 139 Wn. App. at 17-18.

testing posed a concrete harm to J.P.W. Further, Walberg's behavior during visits with J.P.W. indicated that increased visitation and fewer restrictions were not in J.P.W.'s best interest. When Walberg missed her first visit, she yelled and swore repeatedly at social workers, demanding to talk to J.P.W. During the second visit, the social workers reported that Walberg continued to exhibit similar behavior, asserting comments, such as that she can raise her own child and does not need to complete any services and that J.P.W. knows she swears when she gets mad and she does not hide anything from her child. Further, at the end of the second visit, Walberg was whispering to J.P.W. to the extent that the caregiver reported J.P.W. seemed uncomfortable and upset. Later, J.P.W. expressed discomfort with phone visits with Walberg.

Walberg also contends that DSHS failed to investigate whether the foster parent would be willing to provide additional visits. To support this, Walberg cites RCW 13.34.136(2)(b)(ii), which states, "The court and the department or supervising agency should rely upon community resources, relatives, foster parents, and other appropriate persons to provide transportation and supervision for visitation to the extent that such resources are available, and appropriate, and the child's safety would not be compromised."

Here, the individual service and safety plan indicates that DSHS will liberalize the visitation plan if Walberg completes specified services. Although DSHS could only provide two hours of supervised visitation per week, it had the discretion to allow additional visitations if other adults were identified as

appropriate visit supervisors or monitors. Walberg did not ask for increased visitation at trial but requested only that J.P.W. return home immediately. Further, despite Walberg's contention that DSHS did not evaluate community resources, J.P.W.'s foster parent, Shannon Smith, refused to monitor Walberg's phone visits with J.P.W., and Walberg failed to identify other possible supervisors or monitors.

The trial court found that Walberg did not demonstrate she has the ability to care adequately for J.P.W. It made specific findings that Walberg had a history of drug abuse, was currently using drugs, and was incapable of maintaining a stable and healthy environment for J.P.W. without assistance or intervention. Despite Walberg's violation of visitation rules and DSHS's request for reduced visits, the court retained the visitation. The trial court limited visitation only to protect J.P.W.'s health, safety, and welfare. Therefore, the trial court did not abuse its discretion in providing two hours of supervised visitation per week.

## Conclusion

Because the record supports the trial court's conclusion that increased visitation would be harmful to J.P.W. and because DSHS considered community

resources but determined that additional visitation supervised by the foster parent was not available, we affirm.

Leach, C.J.

WE CONCUR:

Cox, J.

Becker, J.