FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 APR 23 PM 12: 29

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of | No. 77046-2-I |
| S.I.<br>DOB: 4/24/2014, | DIVISION ONE |
| Minor, | |
| STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES, | |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| VANLA INTHIRATHVONGSY, | |
| Appellant. | FILED: April 23, 2018 |

MANN, A.C.J. — Vanla Inthirathvongsy appeals the trial court order terminating his parental rights to his daughter S.I. He contends that the Department of Social and Health Services (Department) failed to provide all necessary and available services capable of correcting his parental deficiencies. Because substantial evidence supports the necessary trial court findings, we affirm.

## FACTS

Inthirathvongsy is the father of S.I. Both Inthirathvongsy and S.I.'s mother were homeless and struggled with severe drug addiction.[1] Inthirathvongsy began using methamphetamine before he came to the United States in 1980.

On May 11, 2015, Child Protective Services became involved when S.I.'s mother dropped S.I. off at a relative's house and then disappeared. Inthirathvongsy told an investigating police officer that he was homeless and unable to care for S.I.

On May 12, the Department filed a dependency petition. On the same day, Inthirathvongsy participated in a Family Team Decision Making meeting. He acknowledged that he was homeless and using methamphetamine and was unable to care for S.I. Inthirathvongsy told the Department that he had been diagnosed in the past with post-traumatic stress disorder (PTSD) and that he was willing to participate in services and treatment. The Department placed S.I. into foster care, where she remained until the termination trial.

Inthirathvongsy entered into an agreed dependency order on July 14, 2015. The dispositional order required Inthirathvongsy to complete a drug/alcohol evaluation and a psychological evaluation with a parenting component and follow treatment recommendations; submit to random urinalysis (UA) for 90 days; participate in age-appropriate parenting classes; and find and maintain appropriate housing.

---

[1] The court terminated the mother's parental rights in a separate order, and the mother is not involved in the appeal.

In August 2015, Inthirathvongsy entered into a voluntary agreement with Family Treatment Court (FTC), a specialized dependency court that provides extra support and services for parents with mental health and substance abuse issues. For the first few months, Inthirathvongsy had difficulty complying with the program requirements. He failed to attend sober support groups on multiple occasions, missed UAs, and continued to use methamphetamine. After about four months in the program, Inthirathvongsy was able to remain sober for a period of about two weeks.

In September 2015, Inthirathvongsy completed a chemical dependency assessment with Paul Munson, a licensed chemical dependency professional and mental health practitioner at Harborview's mental health and addiction recovery center. Munson, who also conducted group treatment sessions with Inthirathvongsy at Harborview, diagnosed Inthirathvongsy as addicted to both methamphetamine and heroin. Munson assessed the relapse risk as high, based on Inthirathvongsy's long history of heavy drug use, homelessness, unemployment, dysfunctional relationships, and lack of family support and sober friends.[2]

Based on Inthirathvongsy's specific needs, Munson determined that the best option was Harborview's "level 1.0 . . . co-occurring disorders program," which included both group therapy and individual sessions. Munson felt that "the significance of his mental health symptoms" indicated Inthirathvongsy would be best served by treatment that included not only individual sessions, but also group sessions with others who were dealing with both addiction and mental health issues.

---

[2] Munson completed a second evaluation of Inthirathvongsy in 2016. He testified that Inthirathvongsy's problems remained essentially the same.

In December 2015, Inthirathvongsy was not in compliance, including positive UAs, and the Harborview program recommended that he attend long-term inpatient treatment. The FTC judge ordered Inthirathvongsy to participate in the recommended long-term inpatient treatment at Seadrunar.

Initially, Inthirathvongsy received positive reports about his engagement at Seadrunar, including participation in group sessions. But in January 2016, after he became upset during an encounter with another resident, Inthirathvongsy suddenly left the program. Inthirathvongsy later criticized the Seadrunar program as "working therapy" and referred to it as "a set-up game that . . . they're playing."

FTC placed Inthirathvongsy on probation after he left Seadrunar. Almost immediately, the Department social worker and FTC staff referred him to several inpatient treatment programs, including Thunderbird and SeaMar. Inthirathvongsy did not think he needed an inpatient program and expressed disappointment in the FTC program because he had not yet been reunited with S.I.

On January 31, 2016, Inthirathvongsy was arrested for unlawful possession of a firearm. He remained in jail until the charges were dismissed in April 2016. In March 2016, FTC dismissed Inthirathvongsy from the program for noncompliance with the program and court-ordered requirements.

In May 2016, Inthirathvongsy resumed outpatient treatment at Harborview with Garrett Hebel, a chemical dependency professional and substance abuse counselor. Initially, Hebel met with Inthirathvongsy weekly for individual sessions. Inthirathvongsy believed that his lack of housing was a "strong contributor to his ability to stay sober" and informed Hebel that his primary objective was to achieve

housing. Inthirathvongsy also expressed a desire to work on anger and mental health issues that contributed to his drug use. In Hebel's experience, Inthirathvongsy

> viewed the nature of his drug problem as utility. It was sort of a thing he could do to serve some needs of his. One of those needs being constant alertness, ability to manage and organize and stay focused. Those were some of the primary reasons that Vanla described to me he was using drugs.

Inthirathvongsy also believed that he used drugs in an attempt to exercise control over his PTSD symptoms.

Paul Munson testified that Harborview has a clinic specializing in treatment for trauma-based issues. But the clinic has

> some fairly specific criteria as far as who's an acceptable candidate. One of the most important being that the person have a very solid period of sobriety. This type of trauma-based therapy is very stressful, and persons that don't have a good grasp on their addiction issues don't make good candidates. So it wouldn't have been something that we could have really discussed at the time of [Inthirathvongsy's] assessment; it would have been premature.

After evaluating Inthirathvongsy, a clinician determined that he needed to achieve more long-term sobriety before he could be considered for intensive trauma therapy. Inthirathvongsy then continued his course of treatment with Hebel in the Harborview "mental health track within [the] addictions department."

Hebel acknowledged that although Inthirathvongsy was willing to talk generally about PTSD issues, he was "never actually open to discussing events in detail that might have triggered his PTSD." Nonetheless, Hebel described Inthirathvongsy's reticence as "limiting, but not inhibiting," and Hebel was able to incorporate

techniques for dealing with both PTSD symptoms and anger issues into his treatment sessions with Inthirathvongsy.

Inthirathvongsy's treatment at Harborview included not only individual sessions with Hebel, but also group sessions with the co-occurring disorders group. Munson facilitated the group, which was designed for people who have both addiction and mental health issues. Inthirathvongsy began sessions in the engagement group, which required a lower level of participation. In August or September 2016, after he demonstrated a "solid commitment," Inthirathvongsy advanced to the "action group." The action group met more frequently, allowing participants to address substance abuse and mental health issues in greater depth. But after Inthirathvongsy made some unsettling comments in a group session, Munson discontinued his participation in the group.

Inthirathvongsy apparently resumed some participation in engagement group sessions, but Hebel characterized his attendance as inconsistent. According to Hebel:

> when [Inthirathvongsy] showed that he was willing to be in the program and committed, he was coming to pretty much every meeting or to every appointment. When [Inthirathvongsy] struggled, he failed to make a lot of his appointments.

Inthirathvongsy's overall attendance rate at his group sessions and meetings was about 70 percent.

In September 2016, Inthirathvongsy completed a psychological evaluation, including a parenting component, with psychologist Dr. Gary Wieder, PhD. In

addition to a lengthy history of drug addition, Inthirathvongsy told Wieder that he suffered nightmares and intense distress as a result of traumatic events he experienced in the military in Thailand.

Wieder diagnosed Inthirathvongsy with polysubstance abuse, panic disorder, and PTSD. Wieder's recommendations included abstention from drug use, participation in relapse prevention programs and group support systems, UAs, outpatient counseling for PTSD and panic symptoms to learn coping methods, and parent coaching. Wieder believed that that the "issues related to [Inthirathvongsy's PTSD] could be treated within the context of ongoing counseling rather than some specific PTSD treatment."

Wieder recommended that Inthirathvongsy participate in anger management training if certain older domestic violence allegations were deemed to be credible. But Wieder stressed that "nothing that emerged in the course of my evaluation either in my interview with him, in my observation with him, or in the testing that he completed that suggested a problem with anger management or problems with violent intention."

Wieder testified that the prognosis for methamphetamine users is very poor and the risk of relapse very high. Wieder did not believe that Inthirathvongsy's "anxiety and panic" was likely to impair his parenting ability. Wieder found it difficult to assess the precise effect of Inthirathvongsy's PTSD, but concluded the greatest risk to healthy parenting was Inthirathvongsy's drug use:

by far the greatest risk to healthy parenting is drug abuse and, in particular, methamphetamine abuse. Methamphetamine users can experience delusions and disconnections from reality that would make healthy parenting very difficult. And that's on the up side. That's when the drug is active. It's fast acting. And so it doesn't require a lot of buildup before we start seeing symptoms. So that could easily and quickly lead a parent to be unable to take care of a child. But on the back end of methamphetamine use, heavy users generally crash and sleep for hours and hours and hours and hours, which would raise the risk of neglect or child maltreatment during the post use of methamphetamine. So methamphetamine compromises healthy parenting, and can do that quite quickly.

Cheri Shoecraft, a licensed domestic violence counselor, conducted a domestic violence assessment of Inthirathvongsy in October 2016. Because Inthirathvongsy denied all allegations of physical abuse, Shoecraft concluded that domestic violence treatment would not be useful.

Inthirathvongsy successfully completed parenting classes at Project Safe Care. Inthirathvongsy's counselor described him as fully engaged in the classes. Inthirathvongsy visited S.I. regularly during the dependency. All of the witnesses who had observed Inthirathvongsy's interactions with S.I. agreed that they improved over time and that the two had bonded. Michelle Leonatti, the court appointed special advocate, testified that Inthirathvongsy was appropriately gentle with S.I. and increasingly able to correct her when necessary.

Department social worker Megan Stampfli testified that although Inthirathvongsy had demonstrated intermittent progress and periods of sobriety, his continuing drug use and relapses raised a "very big concern." Stampfli believed that

Inthirathvongsy would have to demonstrate a much longer period of sobriety before the Department could consider returning S.I. to his care:

> What's really difficult in this case is that what we've seen and what Mr. Inthirathvongsy has reported is that he can have significant periods of sobriety. He's told his chemical dependency counselor that he can stay sober for several months but then usually ends up relapsing. And that's what we've seen in this case. He has been able to maintain several months of sobriety at a time and then has subsequently relapsed. So I think that for him, the period of sobriety we would want to see would be a year before we could say that he's using his sober support, he's using his skills. And I just don't think that [S.I.] should have to wait another year. She's already been in foster care for two years. She's three years old. Another year is a significant portion of her life.

Based in part on the length of the dependency, S.I.'s age and need for stability and consistency, and Inthirathvongsy's inability to care for her within the foreseeable future, Stampfli believed that termination was in S.I.'s best interest. S.I. has remained in the same foster care placement for two years. She has bonded with her foster parents, who would like to adopt her.

At trial, Inthirathvongsy acknowledged that he had used methamphetamine "a lot of times" during the two-year dependency. Inthirathvongsy claimed that he was open to talking about the traumatic incidents in his past if a counselor found that it would be helpful and a way to "move forward." He explained that he did not want to return to group sessions because they "remind me about drug use" and that he would rather go to church. Inthirathvongsy asserted that he could safely parent S.I. even if he continued to use drugs.

In January or February 2017, Inthirathvongsy obtained his own apartment through the Downtown Emergency Service Center (DESC). At around this time, Dr.

Caroline Gass, a psychiatry resident at Harborview, diagnosed Inthirathvongsy with PTSD. In late March 2017, Inthirathvongsy began weekly counseling sessions with Dr. Gass "on the side." Hebel testified that at the time of the termination trial in May 2017, Inthirathvongsy continued to struggle with "fluctuating engagement" in his treatment program, "even as [he] has gotten housing." Inthirathvongsy provided positive UAs in January and March 2017.

On June 6, 2017, the trial court entered an order terminating Inthirathvongsy's parental rights.

## ANALYSIS

"Parents have a fundamental liberty and privacy interests in the care and custody of their children." In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995) (citing In re Dependency of J.B.S., 123 Wn.2d 1, 12, 863 P.2d 1344 (1993)); Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). But this right is not absolute. See In re Welfare of Sumey, 94 Wn.2d 757, 762, 621 P.2d 108 (1980); Santosky, 455 U.S. at 766-67. "When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020. Before terminating parental rights, Washington courts must follow a two-step process. First, the State must prove the six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence:

    (a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ; and

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

In addition, due process requires the trial court to expressly or impliedly find by clear, cogent, and convincing evidence that the parent is currently unfit. In re Welfare of A.B., 168 Wn.2d 908, 918-19, 232 P.3d 1104 (2010).

If the court finds the State has met its burden under RCW 13.34.180(1), the court then determines by a preponderance of the evidence if termination is in the best interests of the child. RCW 13.34.190(1)(b); A.B., 168 Wn.2d at 911.

When reviewing the decision to terminate parental rights, we determine whether substantial evidence supports the court's findings of fact by clear, cogent, and convincing evidence. In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016) (citing In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999)). Clear, cogent, and convincing evidence exists when the evidence shows the ultimate fact at issue is highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

We necessarily defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Our deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her." In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

All Necessary and Available Services

On appeal, Inthirathvongsy does not dispute the evidence establishing that he is currently unfit to parent, that there is little likelihood S.I. can be returned in the near future, that continuation of the parent-child relationship clearly diminished S.I.'s prospects for early integration into a stable and permanent home, and that termination is in S.I.'s best interest. He challenges only the trial court's finding that the Department offered or provided all necessary and reasonably available services capable of correcting his parental deficiencies within the foreseeable future. See RCW 13.34.180(1)(d). In order to meet this element, the Department must prove it offered services specifically tailored to the individual's needs. In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). A "protracted delay" in identifying and offering necessary services where parents have not resisted or refused services may undermine a finding that the Department offered or provided all necessary services under RCW 13.34.180(1)(d). In re Dependency of T.L.G., 126 Wn. App. 181, 198-203, 108 P.3d 156 (2005).

Inthirathvongsy first contends the Department failed to produce clear, cogent, and convincing evidence that it provided all services necessary to address his PTSD. He argues that the Department was well aware that PTSD presented a major barrier to his ability to successfully engage in substance abuse treatment and that PTSD counseling sessions with Dr. Gass came too late to benefit him. Inthirathvongsy claims the Department's failure to tailor his services to address PTSD likely led to his inability to complete inpatient treatment and continue participation in group sessions at Harborview.

Contrary to Inthirathvongsy's contentions, however, the record shows that the Department provided services designed to address both his mental health and drug addiction issues. See generally In re Welfare of S.J., 162 Wn. App. 873, 256 P.3d 470 (2011) (Department's adoption of a sequential approach to substance abuse and mental health services caused an unreasonable delay in offering mental health counseling and a parenting assessment).

Paul Munson, a licensed chemical dependency professional and mental health practitioner at Harborview, conducted Inthirathvongsy's chemical dependency assessment. Based on Inthirathvongsy's mental health needs, Munson determined that the best option was Harborview's "co-occurring disorders program," which included both group therapy and individual sessions. The group sessions provided Inthirathvongsy with an expanded opportunity to address the relationship between mental health and addiction issues. Harborview's treatment plan for Inthirathvongsy was also consistent with Dr. Wieder's evaluation. Dr. Wieder believed that

Inthirathvongsy's PTSD issues could be treated within the context of ongoing counseling "rather than some specific PTSD treatment."

Harborview evaluated Inthirathvongsy for the clinic specializing in trauma-based issues, but determined that the program would not be appropriate for him until he could achieve "a very solid period of sobriety." Inthirathvongsy never achieved that goal.

Inthirathvongsy also engaged in individual counseling with Garrett Hebel. Hebel testified that the sessions addressed the relationship between addiction and mental health issues, including PTSD. In conjunction with PTSD, Hebel focused on Inthirathvongsy's "profound distrust of institutions as well as most people that he came into contact with on a day-to-day basis" and attempted to help him recognize "what was in his control and what was outside of his control." In particular, Hebel worked with Inthirathvongsy to recognize the events that triggered his desire to use drugs, such as feelings of anger or frustration and certain auditory stimuli, and develop techniques that would allow Inthirathvongsy to "move past that moment" and avoid a relapse or find relief.

Contrary to Inthirathvongsy's testimony, Hebel stated that Inthirathvongsy was never open to discussing his trauma history in detail. Nonetheless, for purposes of treatment, Hebel found that Inthirathvongsy's reticence was "limiting, but not inhibiting" and did not prevent Hebel from continuing to work with Inthirathvongsy on mental health issues.

The record establishes that the Department provided Inthirathvongsy with extensive services specifically tailored to address both his individual mental health issues, including PTSD, and his addiction issues. But Inthirathvongsy's participation in the offered services was inconsistent at best. Inthirathvongsy stopped attending the group services with Munson that provided an opportunity to address the relationship between mental health issues and addiction in greater depth. And up to the time of trial, Inthirathvongsy continued to view drugs as a viable solution to his problems. Substantial evidence establishes that the Department offered or provided all necessary and reasonably available services capable of correcting parental deficiencies within the foreseeable future in accordance with RCW 13.34.180(1)(d).

Inthirathvongsy next contends that the Department failed to offer or provide anger management classes. But the dependency court never identified anger related issues as a parental deficiency or ordered Inthirathvongsy to complete anger management classes. Nor did any of Inthirathvongsy's evaluations determine that he needed anger management services to rectify a parental deficiency.

Hebel worked with Inthirathvongsy on some anger issues in his counseling sessions, but that was in the context of events that might trigger Inthirathvongsy's drug use. Dr. Wieder recommended that Inthirathvongsy complete anger management classes if the allegations of prior domestic violence were found to be credible. But Inthirathvongsy's domestic violence assessment did not confirm the allegations, and Dr. Wieder testified that nothing in his evaluation or interview with Inthirathvongsy suggested "a problem with anger management or problems with violent intention." None of the trial court's findings suggest that anger-related issues

were a parental deficiency. Mere expressions of anger or hostility toward Department staff during a dependency do not establish a parental deficiency supporting termination. See T.L.G, 126 Wn. App. at 202 (mere hostility and resistance to services does not establish parental unfitness).

Because anger issues were not a parental deficiency, the Department was not required to provide or offer anger management classes as a necessary service.

The order terminating Inthirathvongsy's parental rights is affirmed.

_Mann, A.C.J._

WE CONCUR:

_Cox, J._

_Becker, J._