[Nos. 57862-6-I; 57863-4-I;     Division One.     January 16, 2007.]
57864-2-I; 57865-1-I;
58560-6-I; 58561-4-I.

*In the Matter of the Dependency of* T.L.G. ET AL.

BONNIE LEE DUNLAVY ET AL., *Petitioners*, V. THE DEPARTMENT
OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Christopher Gibson* (of *Nielsen, Broman & Koch, PLLC*), for petitioner Bonnie Lee Dunlavy.

4

*Elaine L. Winters* (of *Washington Appellate Project*), for petitioner William Keith Gilfillen.

*Robert M. McKenna, Attorney General, Kathryn Ann Kamel, Senior Counsel*, and *Michael S. Majors, Assistant*, for respondent.

¶1 AGID, J. — William Keith Gilfillen and Bonnie Lee Dunlavy challenge the juvenile court's suspension of visitation with their dependent children on two grounds: (1) RCW 13.34.136(1)(b)(ii) entitles them to visitation absent a showing of risk to their children's health, safety, or welfare and (2) visitation cannot be used as a sanction for failure to comply with court orders or services.

¶2 Visitation between these parents and their children was suspended in 2002 after an altercation between Gilfillen and a security guard during a scheduled visit in the presence of T.L.G. The legislature amended RCW 13.34.136(1)(b)(ii) in 2004, strengthening parents' rights to visitation with their dependent children. The statute requires the agency to encourage maximum parent and child contact and prohibits it from limiting or denying visitation as a sanction or without a showing of risk of harm. The record in this case establishes that neither the State nor the court below attempted to structure supervised visitation of any kind. There is no proof that there is a risk to these children in all visitation settings. And it appears from the record that visitation remains suspended because the parents did not obtain all court-ordered services even though the statute prohibits a court from limiting or denying visitation for failure to comply with orders or services. Thus, the juvenile court misapplied RCW 13.34.136(1)(b)(ii) when it denied all visitation based on the parents' failure to obtain court-ordered services by failing to find there is a current risk of harm to the children in all visitation settings.

¶3 Gilfillen also challenges the orders prohibiting him from disseminating any documents, reports, and orders without permission of the court and notice to the Department of Social and Health Services (DSHS) and his children's volunteer guardian ad litem (VGAL). Nothing in the record indicates why such a broad order is necessary, although there are references to protecting the children's privacy. In light of the published case, *In re Dependency of T.L.G.*,[1] which reversed a termination order against the parents, it is unclear from the record why such a broad order, which seems to include Gilfillen's own medical records, is necessary. We reverse.

## FACTS

¶4 This is Dunlavy's and Gilfillen's second appeal to this court. In May 2005, we decided *In re Dependency of T.L.G.* We reversed an order terminating their parental rights and remanded for further proceedings.[2] This appeal follows the dependency hearings on remand.

¶5 William Keith Gilfillen and Bonnie Lee Dunlavy are the parents of daughter T.L.G. (born April 20, 1999) and son C.L.G. (born May 22, 2000). C.L.G. was born with serious medical problems. Both parents entered into voluntary contracts for assistance with DSHS, which provided for public health nurse visits, therapeutic day care for both children, and an intensive family preservation services therapist.[3] In August 2001, Dunlavy and Gilfillen refused to sign further voluntary contracts. DSHS filed a dependency petition on both children and removed them from the home because of three concerns: C.L.G. was exhibiting significant growth problems, T.L.G. was exhibiting signs of emotional delay, and the family was facing eviction.[4] The initial shelter care order entered August 2001 provided supervised

---

[1] 126 Wn. App. 181, 185, 108 P.3d 156 (2005).

[2] *Id.*

[3] *Id.*

[4] *Id.* at 186.

visitation once a week at the DSHS office in Everett and required the parents to get psychological evaluations and training to care for C.L.G.'s medical needs.[5] In November 2001, Dunlavy and Gilfillen moved to an appropriate home on Whidbey Island, where rooms were made ready for the children's return.[6]

*January 2002 Dependency Order*

¶6 In January 2002, Dunlavy and Gilfillen signed an agreed dependency order, acknowledging their children's special needs and their own need to address problems with anxiety and depression.[7] The order granted weekly supervised visitation between T.L.G. and both parents for a minimum of two hours. The court gave DSHS and the children's VGAL the discretion to liberalize Dunlavy's visits with both children. It also granted Gilfillen supervised visitation with C.L.G. once paternity had been established.

¶7 Later that month, there was a verbal and physical altercation between Gilfillen and a security guard at the DSHS office while Dunlavy was holding T.L.G.[8] After this incident, all visitation was suspended on the grounds that Gilfillen and Dunlavy needed anger management treatment, and the visitation supervisor refused to continue to work with the family.[9]

*April 2002 Dependency Disposition*

¶8 In April 2002, the court suspended visitation and entered a disposition order requiring parenting classes and a psychological evaluation with a parenting component for

---

[5] *Id.* at 193.

[6] *Id.*

[7] *Id.* at 193-94.

[8] *Id.* at 194. The incident apparently arose because C.L.G. was not brought to the visit.

[9] *Id.*

both parents.[10] The order did not include findings that visitation would harm the children. Both parents completed parenting classes at Catholic Community Services.[11] But the psychological evaluations were delayed because the parties could not agree on a service provider and the parents had problems getting from Whidbey Island to the evaluator's office.

*July 2003 Order*

¶9 In July 2003, the court struck the requirement that the evaluations contain a parenting component but ordered the evaluator to determine whether a parenting component was necessary.[12] Visitation remained suspended, but the court stated it would "reconsider the issue of visitation upon receipt of the parents' psychological evaluations."

*Termination Proceedings and March 2005 Appeal*

¶10 On January 2, 2004, the court terminated Gilfillen and Dunlavy's parental rights to both children.[13] On March 7, 2005, we reversed the termination in *In re Dependency of T.L.G.*, holding that DSHS failed to (1) identify parental deficiencies that needed to be corrected or connect the parents' mental health deficiencies to parental deficiencies; (2) prove that family reunification could not occur within the foreseeable future; and (3) establish by clear, cogent, and convincing evidence that the parents were offered all reasonably available services necessary to cor-

---

[10] The disposition order provided:

"The mother and father shall complete a DSHS and [guardian ad litem] and defense approved psychological evaluation with a parenting component and follow all recommendations. . . . DSHS shall make a referral within two weeks of the date the evaluator is agreed upon [by the parties]. The evaluation of the father shall also address medication issues. The psychological evaluations shall address the issues whether an anger management evaluation and/or treatment is recommended."

*Id.* at 194 n.32 (first alteration in original).

[11] *Id.* at 194.

[12] *Id.* at 195.

[13] *Id.* at 196.

rect parental deficiencies and that there was little likelihood conditions would be remedied in the near future.[14] We noted that there had been no parenting evaluation, no testimony about the parents' mental health issues, and no mental health services or treatment offered over the two years of the dependency.[15] We also rejected the agency's argument that Dr. Bruce A. Olson's testimony that each parent needed three to five years of intensive treatment meant that it would be three to five years before the parents could care for their children.[16] We concluded that "DSHS has not established that family reunification cannot occur within the foreseeable future" and remanded for further proceedings.[17]

*June 2005 Dependency Review Hearing*

¶11 We issued the mandate on April 22, 2005, and the case returned to Snohomish County Superior Court as a dependency. On June 8, 2005, both parents requested the immediate return of their children or, alternatively, visitation. During the hearing, they suggested supervised visits with a therapist who could prepare the children to see them and provide reconciliation therapy to their family. The State asked the court to require that Dunlavy and Gilfillen make substantial gains and show a period of psychological stability before resuming visitation. The children's newly appointed VGAL stated that visitation was not appropriate until the parents completed services and opined that T.L.G. and C.L.G. would benefit from counseling to prepare them for seeing their parents. The VGAL said the children no longer remembered their parents because of their long separation.

¶12 The juvenile court again denied visitation because "the same concerns that led to the dependency are still in

---

[14] *Id.* at 203-06.

[15] *Id.* at 205.

[16] *Id.*

[17] *Id.* at 203-06.

existence and have not been remedied . . . . [T]he parents need to take some action to make it clear that they're taking steps toward addressing the deficiencies that were identified in the dependency previously that would lead the Court to believe that they're working towards, and willing to work towards unification." The court did not address our holding that Gilfillen had not been offered the services needed to address his mostly unidentified parental deficiencies.[18] The court did not order therapeutic counseling as requested by the parents. The written order stated:

> Given the complete lack of contact between the father and the children for over three years, and the specific recommendations made in Dr. Olson's evaluation that demonstration of an extended period of psychological stability would be a necessary prerequisite for consideration of even a parenting assessment, visitation shall remain suspended between the father and the children at this time. Such is necessary to protect the children's health, safety and welfare.[19]

Neither parent sought discretionary review of the June 2005 order.

*August 2005 Dependency Review*

¶13 At the August 30, 2005 review hearing, the State argued visitation was "premature" because the parents had not "engaged in services in a meaningful manner." The VGAL stated visitation should be denied because the parents had not pursued services adequately. Again, the court denied the parents' motion for visitation. In its oral ruling, the court stated:

> So the fact that the parents are not fully engaged in services is not just in and of itself reason to not have visitation as some form of punishment. But I believe that it does indicate that the—there are problems here that need intervention before these children can safely resume contact with their parents,

---

[18] *Id.* at 198-203.

[19] A similar order was entered denying the mother visitation. These findings were affirmed in the May 2006 order.

and that hasn't occurred yet. And as a result I think that, and I find that the visits between the parent and the two children are not in the children's best interest at this time and I will not order any visitation. . . .

In its written ruling, the court stated:

As far as compliance with services, the Mother has done virtually nothing to comply with services. The Father has participated in counseling but has restricted the Department's access to his records. The Father's comments to his counselor . . . raise concerns whether visits will be in the best interest of the children. The parents need intervention through services before visitation can be further addressed.

The court did not address the parents' request for counseling to assist with reunification of their family.

*January 2006 Dependency Review*

¶14 At the January 25, 2006 dependency hearing,[20] the court reviewed both parents' anger management evaluations. They were done in September 2005 by Mr. William S. Mattila, a licensed mental health counselor. Mr. Mattila's evaluation recounted each parent's version of the history of their childrens' dependency. He noted that their version of events differed from the information provided by DSHS and interpreted this difference as evidence that the parents had failed to take responsibility for their problems. He found Dunlavy hostile and reluctant to share personal information during her evaluation. He also noted that she expressed a negative attitude toward DSHS workers, trial counsel, and court processes. He concluded that she had paranoid ideation, was not likely to cooperate with treatment, and had a self-defeating approach to authority figures. Mr. Mattila recommended that the court continue to suspend Dunlavy's visitation until she completed six months of anger management treatment. The evaluation

---

[20] It is unclear from the record whether the parents raised the issue of visitation via motion, though the issue was touched on by the juvenile court in the context of including a parenting component in new psychological evaluations.

did not address any risks Dunlavy would pose during a visit with her children. His written recommendations were as follows:

1.  [Ms.] Dunlavy should be required to attend a minimum of six months of anger management counseling with a licensed mental heath counselor with expertise in this arena.

2.  Ms. Dunlavy should be required to undergo a psychiatric evaluation to address noted paranoid ideation and possible medication intervention.

3.  [Ms.] Dunlavy presents as a significant risk to the health, welfare and safety of her minor children. This is primarily based on her clinical profile of failing to take responsibility and her unwillingness to cooperate with treatment interventions. It is secondarily based on her noted paranoia and the unlikelihood that she will participate in recommended treatment.

4.  Given the history of poor treatment compliance, lack of motivation to treatment and length of time that the children have not had contact with Ms. Dunlavy all visitations with the children should remain suspended until Ms. Dunlavy has demonstrated significant progress and consistency in this treatment for a minimum of three months. . . .

¶15 Gilfillen was apparently more open during his evaluation, but Mr. Mattila found that he did not appreciate the self-defeating effect of his conflicts with authority figures. He described the father as having an "impenetrable life view that absolves him of responsibility" arising out of childhood victimization.[21] Mr. Mattila's written recommendations for Gilfillen were as follows:

1.  Mr. Gilfillen should be required to attend a minimum of one year of anger management counseling with a licensed mental heath counselor with expertise in this arena.

---

[21] Sealed App. to Gilfillen's Mot. for Discretionary Review, Anger Mgmt. Evaluation of Gilfillen at 9.

2.  Mr. Gilfillen presents as a significant risk to the health, welfare and safety of his minor children. This is primarily based on his clinical profile, lack of taking responsibility and deficient insight into his own behavior. It is secondarily based on the history of neglecting or abandoning his children.

3.  Given the history of poor treatment compliance, lack of motivation to treatment and length of time that the children have not had contact with him all visitations with the children should remain suspended until Mr. Gilfillen has demonstrated significant progress and consistency in this treatment for a minimum of six months. Consistency can be described as attending all scheduled appointments. Progress can be defined as taking responsibility for his behavior and developing awareness of the underlying beliefs, values and emotions that provide the intensity of his anger.

4.  Mr. Gilfillen should be required to complete the recommended treatment of individual psychotherapy to address his Axis I diagnosis. This treatment could run concurrently with anger management.

The court again denied visitation. It ruled that psychological evaluations should go forward with parenting components, including contact with the children, unless DSHS sought a court order preventing such contact. Both parents filed notices for discretionary review of these orders. Psychological evaluations with parenting components were scheduled for June 2006 with a new provider in Bellingham, Washington.

*May 2006 Dependency Review Hearing and Order Denying Motion To Reconsider*

¶16 At a contested hearing on May 17, 2006, Gilfillen told the court he was enrolled in a second parenting class and psychotherapy, and had completed an anger management evaluation. He had not yet enrolled in anger management counseling. Gilfillen told the court he had trouble accessing services because of transportation problems and DSHS' referrals to service providers who did not contract with the

State. Both parents requested visitation, but the court found the parents needed to make progress in treatment and the children needed to be "prepared therapeutically" before visitation could begin. The written order stated:

> The findings made in the [June 9, 2005] order regarding suspension of visits still stand. Suspension of visits continues to be necessary to protect the children's health, safety, and welfare. Parents have not yet made sufficient progress in services.

In its oral ruling, the court stated:

> Given the situation that we have, a lot of things need to happen before I can sign [a visitation] order. Both of you need to make some progress in treatment. Both of you need to discuss with treatment providers or psychotherapists or other skilled professionals how you would go about even having such a meeting with your children. . . .
>
> . . . [I]f the parents make some progress, if they get engaged in some services, if we start making, you know, a little bit of progress on down the line that perhaps visitation would be appropriate. Frankly I think if we can make some progress, visitation would be great.
>
> . . . .
>
> But, Mr. Gilfillen and Ms. Dunlavy, you need to make some progress on some services. And if they do that, then we can revisit this issue. So at this time the motion is denied without prejudice upon the development of additional new information with regard to progress in therapy and services, it can be revisited.

On May 30, 2006, both parents filed a motion to reconsider various aspects of the trial court's May 17 order, including continued suspension of visitation. The court denied both parents' motions.

## Gag Orders

¶17 Throughout the course of the dependency, both parents have been prohibited from disseminating any documents, reports, or orders without prior court approval. The dependency disposition order entered on April 16, 2002,

stated: "[t]he mother and the father are prohibited from disseminating any documents, reports and orders issued or filed under this cause without permission of and order of the court following notice to DSHS and the VGAL." Similarly-worded orders were included in the three dependency review orders filed before the court terminated Gilfillen's parental rights in January 2004. The State claimed the restraining order was necessary to protect the children's constitutional right to privacy but agreed to include a provision for prior in camera review.

¶18 In February 2006, Gilfillen and Dunlavy filed separate appeals challenging the juvenile court's orders suspending visitation. Gilfillen also separately appealed the juvenile court's gag orders. We granted discretionary review and consolidated the cases.

## DISCUSSION

*Suspension of Visitation*

¶19 The State asserts the juvenile court did not abuse its discretion when it suspended visitation between Dunlavy and Gilfillen because it was necessary to protect their children's health, safety, and welfare. It argues that visitation was suspended because of Dunlavy's and Gilfillen's own behavior and not as a sanction. It relies on their actions at the DSHS office in January 2002 and their failure since then to present evidence that they had ameliorated the behaviors that led to the initial suspension of visitation or otherwise reduced the risks visitation would pose for the children. The State contends Mr. Mattila's anger management evaluation and VGAL's recommendation support the court's order denying visitation. It also highlights Mr. Mattila's emphasis on Dunlavy's and Gilfillen's inability to take responsibility for the 2002 incident and their respective clinical profiles as typical of abusive parents. The State asserts Dunlavy and Gilfillen failed to challenge Mr. Mattila's conclusions and recommendations or to present evidence to rebut his evaluation, qualifications, or expertise.

¶20 Dunlavy and Gilfillen argue that the trial court abused its discretion by continuing to suspend visitation with their children after this court remanded the matter in May 2005.[22] Both parents also contend the trial court abused its discretion by continuing to suspend visitation because RCW 13.34.136(1)(b)(ii) explicitly declares that restrictions on parent-child contact must be narrowly tailored and cannot be used as a sanction for failing to comply with a court order or required services. Finally, they assert the record does not support the finding that visitation would be harmful to their children's health, safety, and welfare.[23]

¶21 Juvenile courts are given broad discretion in matters concerning the welfare of children, and their decisions are entitled to substantial deference on review.[24] Because a juvenile court must evaluate a considerable amount of information and weigh the credibility of numerous witnesses in order to balance the best interests of a child against a parent's rights, we place " 'very strong reliance' " upon a trial court's determination of what course of action will be for the best interest of the child and will not overturn a ruling on visitation absent an abuse of discretion.[25] A trial court abuses its discretion if its ruling is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons.[26] A decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and

---

[22] *In re Dependency of T.L.G.*, 126 Wn. App. at 185.

[23] Both parents present a number of secondary authorities to emphasize the importance of visitation to the reunification process for children and families involved in the foster care system. The language of the statute is unambiguous, so these studies, while informative, are not necessary to our decision. The statute clearly emphasizes that visitation is not only a right of the family, it is to be suspended or limited only when the visitation itself would pose a risk to a child's health, safety, or welfare.

[24] *In re Custody of S.H.B.*, 118 Wn. App. 71, 78, 74 P.3d 674 (2003), *aff'd*, 153 Wn.2d 646, 105 P.3d 991 (2005).

[25] *In re Dependency of K.R.*, 128 Wn.2d 129, 146, 904 P.2d 1132 (1995) (emphasis omitted) (quoting *In re Pawling*, 101 Wn.2d 392, 401, 679 P.2d 916 (1984)).

[26] *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003).

the applicable legal standard or if the facts do not meet the requirements of the correct standard.[27]

¶22 Statutory interpretation and the question of whether a statute applies to a particular set of facts are issues of law reviewed de novo.[28] When interpreting statutes, our primary goal is to ascertain and give effect to legislative intent.[29] We begin with the statute's plain language and ordinary meaning, but also look to "the applicable legislative enactment as a whole, harmonizing its provisions by reading them in context with related provisions and the statute as a whole."[30]

¶23 Under the dependency and termination statute, chapter 13.34 RCW, the safety of the child prevails over the rights of parents when these two interests conflict. Under RCW 13.34.136(1)(b)(ii), as amended in 2004, visitation is a right of the family. The legislature requires the agency to encourage maximum family contact when it is in a child's best interests and prohibits courts from using visitation as a sanction for a parent's failure to comply with court orders or required services.[31] The 2004 amendments also prohibit a

---

[27] *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

[28] *State v. Jackson*, 91 Wn. App. 488, 491, 957 P.2d 1270 (1998) (citing *State v. Tatum*, 74 Wn. App. 81, 86, 871 P.2d 1123, *review denied*, 125 Wn.2d 1002 (1994)), *review denied*, 137 Wn.2d 1038 (1999).

[29] *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 154 Wn.2d 224, 238, 110 P.3d 1132 (2005) (citing *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 555, 14 P.3d 133 (2000)).

[30] *Id.* at 239 (citing *King County*, 142 Wn.2d at 555, 560).

[31] Former RCW 13.34.136(1)(b)(ii) (2003) provided:

The agency shall encourage the maximum parent and child and sibling contact possible, including regular visitation and participation by the parents in the care of the child while the child is in placement. Visitation may be limited or denied only if the court determines that such limitation or denial is necessary to protect the child's health, safety, or welfare.

Current RCW 13.34.136(1)(b)(ii) (amended 2004) provides:

Visitation is the right of the family, including the child and the parent, in cases in which visitation is in the best interest of the child. Early, consistent, and frequent visitation is crucial for maintaining parent-child relationships and making it possible for parents and children to safely reunify. The agency shall encourage the maximum parent and child and sibling contact possible, when it

court from limiting or denying visitation without a showing of risk.

¶24 Visitation between these parents and their young children has been suspended for nearly five years. Even though the 2004 amendments to RCW 13.34.136(1)(b)(ii) strengthened the parents' visitation rights and commanded the agency to encourage maximum parent-child contact, DSHS has made no attempts to reunite this family since either the amendments or our 2005 remand. Nor does the record support the juvenile court's rulings denying all visitation. The State relies on Mr. Mattila's anger management evaluation to support the juvenile court's orders, but these evaluations do not address how Dunlavy's or Gilfillen's anger management issues or clinical profiles would pose a risk to their children in the context of a supervised visit. One incident, nearly five years ago, well before the legislature amended RCW 13.34.136(1)(b)(ii), is an insufficient basis to deny all visitation between Dunlavy and Gilfillen and their young children. The record is replete with indications that their failure to obtain court-ordered services is the basis for denying visitation and finding a risk of harm, but there are no findings about how a visit would harm their children. The legislatively-mandated risk of harm must be an actual risk, not speculation based on reports like those relied on here. Nor does the statute require parents to prove the absence of risk. Rather, it places the burden on the agency to encourage

is in the best interest of the child, including regular visitation and participation by the parents in the care of the child while the child is in placement. Visitation shall not be limited as a sanction for a parent's failure to comply with court orders or services where the health, safety, or welfare of the child is not at risk as a result of the visitation. Visitation may be limited or denied only if the court determines that such limitation or denial is necessary to protect the child's health, safety, or welfare. The court and the agency should rely upon community resources, relatives, foster parents, and other appropriate persons to provide transportation and supervision for visitation to the extent that such resources are available, and appropriate, and the child's safety would not be compromised.

The amendments to this statute were passed in response to a report of the Dependency and Termination Equal Justice Committee, which emphasized on page 19 that the "frequency and quality of visitation has been shown to be a strong indicator of a family's likelihood of success in dependency and termination cases." The report can be found at http://www.opd.wa.gov/Publications/Dependency20&20Termination20Reports/200320DTEJ20Report.pdf (December 2003) (last visited Jan. 2007).

maximum parent-child contact and to prove that visitation poses a current concrete risk to the children. While these parents may well have acted inappropriately five years ago, that incident is ancient history in the lives of this family. Something more than opinions based on a single incident is necessary to support a finding of risk of harm.

■ ¶25 Dunlavy, Gilfillen, and their children will certainly require preparation to become reunited, but nothing in the record explains DSHS' failure to arrange therapeutic counseling services to prepare the children for reunification. There are many ways to structure visitation that would satisfy the statute's clear directive to encourage visitation while limiting actual risks to the children, including telephone visits and supervised visitation with licensed professionals. We are troubled by the court's failure to order therapeutic visits or structure any contact that would begin the process of reunification. Indeed, by keeping this family apart for so long, the State has exacerbated the problem and is now using the extended separation itself as a reason to deny visitation. While the State repeatedly argues that the court did not suspend visitation as a sanction, it is difficult to view the orders as anything but a sanction given the repeated mention by the court, the State, and its witnesses that visitation should not resume until each parent made sufficient progress in court-ordered services. Sadly, it appears these parents are caught in an endless catch-22, a circumstance that would frustrate and anger any parent. We hold the juvenile court misapplied the clear language of the statute by denying visitation as a sanction and without a showing of actual harm.

*Speech Restrictions*

¶26 Gilfillen argues the court restricted his right to free speech without hearing evidence of harm to his children or considering less drastic means of protecting his children's privacy rights. He argues the court's order is overly broad because it restricts his ability to provide information about his own anger management evaluation with service providers and prevents him from discussing information pre-

sented and filed in open court. While RCW 13.50.010(1) and RCW 13.50.100(2) mandate that juvenile court files in dependency cases not be made public, he asserts that the statute does not limit a parent's right to access all information kept by a juvenile court or prohibit a parent from releasing information concerning issues in his own case. Finally, he contends that the State's failure to address his arguments about the unconstitutionality of the order as a prior restraint on his free speech rights is a concession that the gag order is unconstitutional.

¶27 The State essentially argues that Gilfillen waived his right to appeal this issue because he did not object to the court's order or raise it at either the January or May 2006 review. And it contends the restriction was not overly burdensome because the court amended the order at Dunlavy's request to include in camera review. We disagree.

¶28 Under RAP 2.5(a), an alleged error may be raised for the first time on appeal if it involves a manifest error concerning a constitutional right.[32] Issues involving the exercise of free speech in the civil arena can be raised for the first time on appeal.[33] Chapter 13.50 RCW governs the maintenance and release of dependency records by juvenile justice or care agencies.[34] RCW 13.50.100(2) states: "[r]ecords covered by this section shall be confidential and shall be released only pursuant to this section and RCW 13.50.010." The statute provides for access to juvenile court records and files under certain conditions, but it requires that confidentiality and a juvenile's anonymity be preserved.[35]

¶29 The order restraining Gilfillen from disseminating information was recommended first by the VGAL at the March 2002 hearing. At that hearing, the court prohibited both parents from "disseminating any documents, re-

---

[32] *State v. Lynn*, 67 Wn. App. 339, 342, 835 P.2d 251 (1992).

[33] *State v. Easterling*, 157 Wn.2d 167, 179, 137 P.3d 825 (2006).

[34] *In re Dependency of J.B.S.*, 122 Wn.2d 131, 134, 856 P.2d 694 (1993).

[35] *See* RCW 13.50.010(8).

ports and orders issued or filed under this cause without permission of and order of the court following notice to DSHS and the VGAL." This order later included a provision for in camera review of requests for dissemination. But in light of the published opinion in the termination case, the record does not contain a sufficient basis to support such a broad restriction on Gilfillen's speech. The facts of this case are already in the public domain, and Gilfillen should be able to discuss it openly so long as his children's names remain confidential. Further, while RCW 13.50.100(2) requires juvenile court records to remain confidential, it applies to information about the juvenile but does not limit an adult involved in the proceeding from accessing or disseminating information concerning his or her own medical or health records. On remand, the trial court should fashion an order that is the least restrictive alternative that will achieve these limited goals.[36]

## CONCLUSION

¶30 We reverse and remand this matter to the Thurston County Juvenile Court. On remand, the trial court is to require DSHS to take immediate steps toward reunifying this family in accordance with chapter 13.34 RCW and our opinion. We also reverse the orders prohibiting Gilfillen from disseminating information about the case. The trial court shall schedule an immediate hearing to determine whether a protective order is necessary and, if so, enter a new order that is consistent with Gilfillen's constitutional and statutory rights.

COLEMAN and BAKER, JJ., concur.

Reconsideration granted and opinion modified March 5, 2007.

---

[36] In Gilfillen's reply brief, he included additional facts that referenced exhibits submitted during the 2004 termination proceeding under Snohomish County Cause Nos. 03-7-00692-7 and 03-7-00693-5. The State filed a motion to strike those portions of Gilfillen's reply brief and supplemental clerk's papers on the grounds these exhibits were not before the trial court when it entered the orders on appeal. We need not consider this motion to strike because we did not consider these exhibits on appeal.