# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of: L.A.H., DOB 01/26/2018, | DIVISION ONE |
| Minor Child, | No. 81456-7-I |
| WASHINGTON STATE DEPARTMENT OF CHILDREN, YOUTH & FAMILIES, | UNPUBLISHED OPINION |
| Respondent, | |
| v. | |
| KAUTIA HOPKINS, | |
| Appellant. | |

DWYER, J. — Kautia Hopkins appeals from an order terminating her parental rights to her biological child, L.A.H. Hopkins contends that RCW 13.34.180 and .190, which authorize the termination of the parent-child relationship, are unconstitutional as applied to her. This is so, she avers, because these statutes did not require the Department of Children, Youth, and Families to establish that continuation of the dependency resulted in a "concrete risk of harm" to L.A.H. Additionally, Hopkins asserts that substantial evidence does not support the trial court's findings that (1) continuation of the parent-child relationship clearly diminished L.A.H.'s prospects for early integration into a stable and permanent home, and (2) termination of the parent-child relationship was in the best interests of L.A.H. Finding no error, we affirm.

I

Kautia Hopkins and Jonathan Sievert are the biological parents of L.A.H.[1] Hopkins and Sievert met in 2013. After meeting Sievert, Hopkins started to use methamphetamine. Around that same time, Hopkins' mother, Linda Schneider, also started to use methamphetamine. On occasion, Hopkins and Schneider used methamphetamine together.

In June 2014, Hopkins and Sievert's first child, D.H., was born. Hopkins testified that she remained "clean" for "that whole summer." However, after that summer ended, Hopkins began using methamphetamine on a daily basis.

In 2015, Hopkins realized that she was pregnant with a second child, M.H. Although Hopkins attempted to quit using methamphetamine, she was unable to do so. In June 2015, M.H. was born exposed to methamphetamine. During the dependencies of D.H. and M.H., Hopkins and Sievert did not engage in any services and their parental rights to the children were terminated by default.

In 2016, Hopkins learned that she was pregnant with a third child, J.H. Again, Hopkins attempted to "get clean." She also separated from Sievert. In June 2016, J.H. was born. At that time, Hopkins was homeless and living out of her car. J.H. was removed from Hopkins' care because blood tests revealed "drug use" during the pregnancy. Hopkins agreed to a dependency with regard to J.H.

---

[1] This statement of facts is primarily based on unchallenged findings of fact contained within the trial court's order terminating the parent-child relationship between Hopkins and L.A.H. These unchallenged findings of fact are verities on appeal. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). The findings of fact that are challenged by Hopkins on appeal are identified accordingly.

In August 2016, Hopkins entered a family drug treatment court program. That same month, she participated in a 28-day inpatient treatment program. After completing the inpatient program, Hopkins entered into an outpatient treatment program.

In October 2016, Hopkins was provided an apartment through a shelter program. During Hopkins' involvement in the shelter program, Sievert occasionally stayed at her apartment. Around December 2016, Hopkins and Sievert had a disagreement. Hopkins testified that Sievert "wasn't doing what he was supposed to . . . i.e., treatment, engage in services, anything." Additionally, Sievert was "spending time" with other women, and he would occasionally bring women back to the apartment. During the disagreement, Sievert became angry with Hopkins. He damaged Christmas decorations in the apartment and urinated on Hopkins' clothing.

Law enforcement responded to the incident and arrested Sievert. At that time, Sievert had an outstanding warrant related to a domestic violence incident involving Schneider. Sievert was placed in jail for approximately one month.

While Sievert was in jail, Hopkins maintained compliance with the requirements of the family drug treatment court program. However, upon Sievert's release from jail, Hopkins resumed her relationship with Sievert and "faltered on compliance" with the program. In March 2017, Hopkins was "terminated" from the family drug treatment court program.

In October 2017, Hopkins completed the outpatient treatment program she had entered in late 2016.  Upon completing the outpatient program, Hopkins claimed to have maintained her sobriety since August 2016.

On November 2, 2017, the Department of Children, Youth, and Families convened a "shared planning meeting" with regard to J.H.  Sievert did not participate in the meeting because he was in jail.  At the meeting, Hopkins announced that she was pregnant with L.A.H. and that Sievert was the father.  Hopkins expressed that "she had learned a lot about domestic violence" and that she "had no plans to reunify with Mr. Sievert after his release from jail."  When asked about her relationship with Schneider, Hopkins stated that she had regular contact with Schneider via telephone.  Yet Hopkins denied that Schneider was residing in her apartment.

Sometime after the meeting, Department employees and a court appointed special advocate learned that, upon Sievert's release from jail, Sievert, Hopkins, and Schneider rented a hotel room for one week in order to "spend time together."  Drug use occurred in the hotel room.[2]

On November 17, 2017, the Department convened an "emergent shared planning meeting."  At this meeting, Hopkins admitted that Schneider was, in fact, residing in her apartment.  Hopkins also reported that Schneider was using "controlled substances" in the apartment.  Additionally, Hopkins stated that she had ongoing contact with Sievert while he was in jail.  In particular, she and

---

[2] The court appointed special advocate testified that Hopkins denied using drugs in the hotel room.  Instead, Hopkins claimed that only Sievert and Schneider were using drugs in the hotel room.

4

Sievert had daily telephone contact and Hopkins visited Sievert on weekends. Hopkins agreed to participate in a "hair follicle test." The results of the test were positive for the use of methamphetamine.

On January 26, 2018, L.A.H. was born. Three days later, on January 29, the Department filed a dependency petition in the Snohomish County Superior Court. That same day, L.A.H. was removed from the custody of his parents "due to suspected substance abuse, mental health issues, and domestic violence between the parents." L.A.H. was placed with a family who previously adopted two of his older siblings, D.H. and M.H.[3]

On January 31, 2018, the superior court conducted a shelter care hearing. Following the hearing, the superior court ordered that L.A.H. was to remain in out-of-home care. In a disposition order entered on February 27, 2018, Hopkins agreed to a dependency with regard to L.A.H. The disposition order also required Hopkins to participate in several services, obtain a drug and alcohol evaluation, and participate in random drug tests.

Hopkins completed a drug and alcohol evaluation through Evergreen Recovery Center. Evergreen Recovery Center recommended that Hopkins complete a six-month residential inpatient treatment program. However, Hopkins requested to instead be placed in an outpatient treatment program. On May 23, 2018, Hopkins was admitted into an outpatient program. Hopkins missed several group sessions in the program and struggled to maintain abstinence.

---

[3] L.A.H.'s other sibling, J.H., was ultimately adopted by a different family.

In June 2018, Evergreen Recovery Center reassessed Hopkins and determined that she required a higher level of care. Evergreen Recovery Center again recommended that Hopkins engage in a six-month residential treatment program. Hopkins received a "bed date" for the program, but refused to go. Instead, Hopkins participated in a 30-day outpatient program. In July 2018, Hopkins was discharged from the outpatient program with a recommendation that she receive inpatient treatment. In September 2018, Hopkins relapsed.

On November 28, 2018, the Department filed a termination petition in the Snohomish County Superior Court. The petition alleged, among other things, that Hopkins' "parenting deficiencies include mental health issues, substance abuse issues, . . . [and] ongoing involvement with unsafe, using individuals." In January 2019, Hopkins began another outpatient treatment program. The following month, however, Hopkins relapsed again.

In September 2019, Hopkins participated in a psychological evaluation with a clinical psychologist, Dr. Sierra Swing. Dr. Swing opined that Hopkins abused methamphetamine. Dr. Swing recommended that Hopkins participate in a 6-to-12 month inpatient treatment program to address substance abuse and mental health difficulties. Additionally, Dr. Swing recommended that Hopkins participate in several support groups, change her living environment, and engage in therapy to address her trauma.

Following Dr. Swing's evaluation, Hopkins did not engage in any treatment. Hopkins also missed two scheduled appointments to obtain a drug

and alcohol assessment. Moreover, on several occasions, Hopkins failed to participate in drug tests that the Department had requested.

On January 22, 2020, the Snohomish County Superior Court conducted a fact-finding hearing.[4] The trial court heard two days of testimony in January and resumed the hearing for an additional two days in March. During the first day of the hearings, Hopkins testified that she had been "clean and sober" since August 2019. The following day, however, Hopkins participated in a drug test and tested positive for the use of methamphetamine.

On April 14, 2020, the trial court entered an order terminating Hopkins' parental rights to L.A.H. The termination order contained 268 findings of fact. The trial court found that "[i]f [Hopkins] did all of her services, starting now, it would be a minimum of 12 to 18 months before [she] could safely engage in reunification." Finding of Fact 2.183. The trial court also found that L.A.H. "is in a stable home, which is willing to be permanent and adopt." Finding of Fact 2.259. Notably, the trial court found that "[c]ontinuation of the parent-child relationship clearly diminishes [L.A.H.]'s prospect for early integration into a stable and permanent home." Finding of Fact 2.263.[5] Additionally, the trial court found that "[i]t is in the best interest of [L.A.H.] that all of the parental rights of Kautia Hopkins be terminated." Finding of Fact 2.268.[6]

Hopkins appeals.

---

[4] Sievert did not appear for the hearing and his parental rights with regard to L.A.H. were terminated. Sievert did not appeal.

[5] Hopkins challenges this finding of fact on appeal.

[6] Hopkins also challenges this finding of fact on appeal.

II

Hopkins contends that RCW 13.34.180 and .190—which authorize the termination of parental rights—are unconstitutional as applied to her. According to Hopkins, the Department did not establish that continuation of the dependency resulted in a "concrete risk of harm" to L.A.H.[7] As such, she avers, the termination of her parental rights was not narrowly tailored to further a compelling state interest. Because the Department established that continuation of the dependency posed the requisite risk of harm to L.A.H., we disagree.

We review constitutional challenges de novo. A.W., 182 Wn.2d at 701. Additionally, we presume statutes to be constitutional. A.W., 182 Wn.2d at 701. "[T]he challenger of a statute must prove beyond a reasonable doubt that the statute is unconstitutional." A.W., 182 Wn.2d at 701. "'Beyond a reasonable

---

[7] Hopkins did not raise her constitutional challenge in the trial court. However, we may review an assignment of error that is raised for the first time on appeal when the claimed error concerns a "'manifest error affecting a constitutional right.'" State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009) (quoting RAP 2.5(a)(3)). "To raise an error for the first time on appeal under RAP 2.5(a), the appellant must show (1) the error is manifest and (2) the error is truly of constitutional dimension." A.W., 182 Wn.2d at 700 n.10 (citing O'Hara, 167 Wn.2d at 98). "To determine if the error is of constitutional magnitude, we look to see whether, if correct, the claim would implicate a constitutional interest." A.W., 182 Wn.2d at 700 n.10. Additionally, "[a]n error is manifest if there is actual prejudice." A.W., 182 Wn.2d at 700 n.10. "Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case." State v. Lynn, 67 Wn. App. 339, 345, 835 P.2d 251 (1992). "If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest." State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

Hopkins' claim of error satisfies the requirements of RAP 2.5(a)(3). First, Hopkins' claimed error implicates a constitutional interest. See, e.g., Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (parents have a "fundamental liberty interest . . . in the care, custody, and management of their child"). Second, the claimed error is manifest because Hopkins makes a plausible showing that it had practical and identifiable consequences at trial. Indeed, Hopkins contends that Washington's termination statutes violate substantive due process because they did not require the Department to establish that L.A.H. was sufficiently harmed by the continuation of the dependency before Hopkins' parental rights to L.A.H. were terminated. The evidence necessary to determine the merits of this claim of error is contained within the record. Therefore, we review Hopkins' assignment of error.

doubt' in this context merely means that based on our respect for the legislature, we will not strike a duly enacted statute unless we are 'fully convinced, after a searching legal analysis, that the statute violates the constitution.'"[8]  Sch. Dists.' All. for Adequate Funding of Special Educ. v. State, 170 Wn.2d 599, 606, 244 P.3d 1 (2010) (quoting Island County v. State, 135 Wn.2d 141, 147, 955 P.2d 377 (1998)).

Our Supreme Court "has repeatedly emphasized that parents have a fundamental liberty and privacy interest in the care and custody of their children."  In re Dependency of J.B.S., 123 Wn.2d 1, 12, 863 P.2d 1344 (1993).  However, these interests are not absolute.  It is well established that the State has a "parens patriae" and an "'urgent interest'" in the welfare of children.  Santosky, 455 U.S. at 766-67 (quoting Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981)).  Accordingly, our legislature has declared that "[w]hen the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail."  RCW 13.34.020.

---

[8] Hopkins asserts that, because her constitutional challenge involves a fundamental right, strict scrutiny applies and we should presume that the termination statutes are unconstitutional. Moreover, Hopkins avers, the Department bears the burden of establishing that the termination statutes, as applied, survive strict scrutiny.  Hopkins cites to federal case law in support of her argument.  However, our Supreme Court has explained that "[i]n Washington, it is well established that statutes are presumed constitutional and that . . . the challenger must prove that the statute is unconstitutional beyond a reasonable doubt."  Sch. Dists.' All., 170 Wn.2d at 605. Moreover, we have repeatedly presumed RCW 13.34.180 and .190 to be constitutional in the context of both facial and as-applied constitutional challenges to these statutes.  See, e.g., In re Dependency of M.-A.F.-S., 4 Wn. App. 2d 425, 445, 421 P.3d 482 (2018); In re Dependency of I.J.S., 128 Wn. App. 108, 115, 114 P.3d 1215 (2005); In re Welfare of H.S., 94 Wn. App. 511, 524, 973 P.2d 474 (1999).  Accordingly, Hopkins bears the burden of establishing that RCW 13.34.180 and .190 are unconstitutional as applied to her.

"Because parents have a fundamental liberty interest in the care and custody of their children, we examine the termination statutes under the strict scrutiny standard." M.-A.F.-S., 4 Wn. App. 2d at 446. "In termination proceedings, the State has a compelling interest in preventing harm or the risk of harm to the child." In re Dependency of T.C.C.B., 138 Wn. App. 791, 796, 158 P.3d 1251 (2007). To this end, "[t]he termination statutes are narrowly tailored to ensure not only that the requisite harm to the child is not merely an abstract concept but also that continuation of the parental relationship is a barrier to permanency." M.-A.F.-S., 4 Wn. App. 2d at 450.

Before parental rights may be terminated, the Department must first prove the six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence.[9] M.-A.F.-S., 4 Wn. App. 2d at 446. Additionally, due process requires

---

[9] The six statutory elements of RCW 13.34.180(1) provide:
    (a) That the child has been found to be a dependent child;
    (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
    (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
    (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
    (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided. . . .
        . . . ; and
    (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

the court to "make a finding of current unfitness before parental rights can be terminated." In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016). "Satisfying all six of the statutory elements raises an implied finding of parental unfitness." K.M.M., 186 Wn.2d at 479. If the court determines that the State has met its burden under RCW 13.34.180, the court must then determine by a preponderance of the evidence whether termination is in the best interests of the child. RCW 13.34.190(1)(b).

Hopkins contends that "the termination statutes violate substantive due process as applied to cases where the State fails to prove that continuation of the dependency constitutes a concrete risk of harm to the child." Hopkins' contention fails for the three reasons we will next discuss.

A

First, Hopkins incorrectly asserts that the State has a compelling interest in terminating parental rights only when there exists a *concrete* risk of harm to the child. In support of her argument, Hopkins cites to our opinion in In re Dependency of T.L.G., 139 Wn. App. 1, 156 P.3d 222 (2007). However, the issue in T.L.G did not involve the termination of parental rights pursuant to RCW 13.34.180 and .190. Rather, it involved a challenge to a trial court's order that denied two parents the right to visitation with their children during a dependency. T.L.G., 139 Wn. App. at 4.

In that case, the trial court suspended the parents' visitation rights without finding that the parents posed a current risk of harm to the children in all visitation

settings.  T.L.G., 139 Wn. App. at 17.  However, under the applicable statute concerning visitation rights:

> "Visitation shall not be limited as a sanction for a parent's failure to comply with court orders or services where the health, safety, or welfare of the child is not at risk as a result of the visitation. Visitation may be limited or denied only if the court determines that such limitation or denial is necessary to protect the child's health, safety, or welfare."

T.L.G., 139 Wn. App. at 16 n.31 (quoting former RCW 13.34.136(1)(b)(ii) (2004)).

We explained that the "*legislatively-mandated* risk of harm must be an actual risk" of harm.  T.L.G., 139 Wn. App. at 17 (emphasis added).  As such, "it places the burden on the agency to encourage maximum parent-child contact and to prove that visitation poses a current concrete risk to the" child or children in question.  T.L.G., 139 Wn. App. at 17-18.

T.L.G. did not hold that, under RCW 13.34.180 and .190, the State must establish a current concrete risk of harm to a child before a parent's parental rights may be terminated.  Likewise, it did not hold that, in termination proceedings, the State has a compelling interest only when there exists a current and concrete risk of harm to the child or children in question.  Thus, Hopkins incorrectly contends that the Department was required to prove that continuation of the dependency posed a current and concrete risk of harm to L.A.H. before her parental rights were terminated.

B

Second, Hopkins unconvincingly asserts that Washington case law analyzing RCW 13.34.180(1)(f) relieved the Department of its burden of

establishing that termination was necessary to prevent the requisite harm or risk of harm to L.A.H.

RCW 13.34.180(1)(f) requires that the Department establish "[t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." Our Supreme Court has explained that "proof of the allegation in [RCW 13.34.180(f)(1)] establishes that continuation of the parent-child relationship will harm the child." In re Dependency of K.S.C., 137 Wn.2d 918, 930, 976 P.2d 113 (1999). Additionally, we have explained that "RCW 13.34.180(1)(f) 'is mainly concerned with the continued effect of the *legal* relationship between parent and child, as an obstacle to adoption; it is especially a concern where children have potential adoption resources.'" M.-A.F.-S., 4 Wn. App. 2d at 450 (quoting In re Dependency of A.C., 123 Wn. App. 244, 250, 98 P.3d 89 (2004)).

To meet its burden under RCW 13.34.180(1)(f), the Department must establish either that (1) "prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement" or (2) "the parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable placement." In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013).

Hopkins' contention regards the first manner by which the Department may satisfy the requirements of RCW 13.34.180(1)(f).[10] Hopkins avers that the

---

[10] Specifically, Hopkins asserts that "[c]aselaw establishes that RCW 13.34.180(1)(f) is met based merely upon a showing that a dependent child has adoption prospects."

Department cannot meet its burden of establishing the requisite risk of harm to a child when the child "is in a stable placement where he is thriving." According to Hopkins, the record demonstrates that L.A.H. was doing well during the dependency. For example, the trial court found: "The mother's parenting skills are good. Her parenting of [L.A.H.] is loving and appropriate. The mother does not have a parental deficiency related to parenting skills." Finding of Fact 2.191. Additionally, Dr. Sierra Swing testified that termination of Hopkins' parental rights "would be traumatic and potentially disruptive [for L.A.H.] just as a result of . . . losing an attachment relationship and a secure bond that he has with his mother."[11]

However, the only limiting criterion that Hopkins suggests as to when a parent's parental rights may be terminated is if there exists a "current, concrete risk of harm to the child." Yet, as we have explained, "the State has a compelling interest in preventing harm or the risk of harm to the child." T.C.C.B., 138 Wn. App. at 796. The State's interest is not limited to protecting against a *current, concrete* risk of harm to the child.

In any event, the statutory framework of chapter 13.34 RCW emphasizes not only a child's right to permanency, but also the need for a speedy resolution of dependency proceedings. Indeed, the expressly stated purpose of chapter

---

[11] Notably, Dr. Swing also testified that "it would be difficult in the other direction as well if [L.A.H.] lost his kind of bond or relationship with his current caregiver." Moreover, when asked how "lack of permanency" may impact a child, Dr. Swing opined: "It can be very significant. It can, you know, create a sense of unpredictability and, you know, inconsistency that creates anxiety and behavioral difficulties over time, so any amount of stability and consistency and predictability for kids is extremely important." In any event, we "defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence." K.M.M., 186 Wn.2d at 477.

13.34 RCW recognizes the rights of children to both a permanent home and a speedy resolution of dependency proceedings:

> When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail. In making reasonable efforts under this chapter, the child's health and safety shall be the paramount concern. *The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter.*

RCW 13.34.020 (emphasis added).

To this end, in order to terminate a parent's parental rights, the Department must establish that

> there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.

RCW 13.34.180(1)(e).

Additionally, RCW 13.34.145(1)(b) mandates that a permanency planning hearing take place "no later than twelve months . . . following the date of removal" and that "[e]very effort . . . be made to provide stability in long-term placement" unless it is in the best interests of the child to return home.

Next, RCW 13.34.145(1)(c) emphasizes the need to achieve permanency as early as possible:

> Permanency planning goals should be achieved at the earliest possible date, preferably before the child has been in out-of-home care for fifteen months. In cases where parental rights have been terminated, the child is legally free for adoption, and adoption has been identified as the primary permanency planning goal, it shall be

15

a goal to complete the adoption within six months following entry of the termination order.

In light of this statutory scheme, we have explained that "continuation of the dependency rather than termination of parental rights would impede, not facilitate, the goal of permanency by effectively prolonging the 'limbo' of foster care." M.-A.F.-S., 4 Wn. App. 2d at 453. Thus, to satisfy RCW 13.34.180(1)(f), the Department may establish that "prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement." R.H., 176 Wn. App. at 428.

C

Finally, the unchallenged findings of fact demonstrate that termination of the dependency was necessary to prevent harm or the risk of harm to L.A.H. See A.W., 182 Wn.2d at 711 ("Unchallenged findings of fact are verities on appeal."). The trial court's findings of fact demonstrate that Hopkins was severely addicted to methamphetamines. Indeed, the trial court found that Hopkins "did not make progress in the area of substance abuse. The mother continues to use methamphetamine, even during the pendency of this trial." Finding of Fact 2.248. Moreover, the trial court's findings indicate that Hopkins was not engaged in any services to treat her addiction: "Even during the six weeks between trial dates, the mother did not renew engagement in necessary services such as a drug and alcohol assessment and treatment." Finding of Fact 2.254. The trial court determined that "[i]f the mother did all of her services, starting now, it would be a minimum of 12 to 18 months before the mother could safely engage in reunification." Finding of Fact 2.183.

However, when faced with similar consequences with her three prior children, Hopkins failed to satisfy her obligations in order to retain her parental rights to those children:

> Ms. Hopkins's devastating, long term addiction to methamphetamines impaired her ability to even participate in, let alone parent, the dependencies related to two prior children, and caused her to relinquish her parental rights as to a third.

Finding of Fact 2.217.

Lastly, the trial court found that L.A.H. was "in a stable home, which is willing to be permanent and adopt." Finding of Fact 2.259. When the trial court entered the termination order, L.A.H. had been "out of home" for over two years. Findings of Fact 2.13 and 2.14.[12] Indeed, and sadly, L.A.H. "has never lived with either parent." Finding of Fact 2.14.

Hopkins asserts that the Department failed to establish that termination of her parental rights fulfilled a compelling state interest because the Department "has only offered speculation about possible future harms to L.A.H." Not so. The unchallenged findings of fact demonstrate that prospects for a permanent home existed, but Hopkins' legal relationship to L.A.H. prevented him from obtaining that placement. Simply put, these findings of fact established that continuation of the parent-child relationship posed the requisite risk of harm to L.A.H.

Accordingly, Washington's termination statutes are not unconstitutional as applied to this case.

---

[12] Finding of Fact 2.13 provides: "[L.A.H.] remains out of home to date." Additionally, Finding of Fact 2.14 states: "[L.A.H.] has not been returned to any parent at any time since January 29, 2018." The termination order was entered on April 14, 2020.

III

Hopkins contends that substantial evidence does not support the trial court's finding that continuation of the parent-child relationship clearly diminished L.A.H.'s prospects for early integration into a stable and permanent home. We disagree.

"In reviewing the decision to terminate parental rights, an appellate court determines whether substantial evidence supports the findings of fact by clear, cogent, and convincing evidence." M.-A.F.-S., 4 Wn. App. 2d at 455. "Clear, cogent, and convincing evidence exists when the evidence shows the ultimate fact at issue is highly probable." M.-A.F.-S., 4 Wn. App. 2d at 455 (citing In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995)). We "defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence." K.M.M., 186 Wn.2d at 477. Additionally, unchallenged findings of fact are verities on appeal. A.W., 182 Wn.2d at 711.

RCW 13.34.180(1)(f) requires that the Department establish "[t]hat continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." The Department can meet its burden under RCW 13.34.180(1)(f) by establishing that "prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement." R.H., 176 Wn. App. at 428.

Here, the trial court found that "[c]ontinuation of the parent-child relationship clearly diminishes [L.A.H.]'s prospect for early integration into a stable and permanent home." Finding of Fact 2.263. This finding of fact is

18

supported by substantial evidence because, as we previously explained, the unchallenged findings of fact demonstrate that prospects for a permanent home existed but the parent-child relationship prevented L.A.H. from obtaining that placement.

Hopkins asserts that substantial evidence does not support the trial court's finding under RCW 13.34.180(1)(f) because there is "no evidence that [L.A.H.'s] placement or adoption prospect was in jeopardy if termination did not occur at this time." To the contrary, Hopkins avers, the "record established [that] L.A.H. is integrated into a stable home."[13]

However, we have previously rejected a similar argument. In In re Dependency of A.D., a mother "argue[d] that, because her children were already in a stable placement, maintaining her legal relationship to them had no impact." 193 Wn. App. 445, 457, 376 P.3d 1140 (2016). We reasoned that such an argument "addresse[d] only the stability of [her children's] placement, not its permanence. Although [a child's] foster home may have been *stable*, it is, by definition, temporary." A.D., 193 Wn. App. at 458. We also explained that RCW 13.34.180(1)(f) may be satisfied by substantial evidence when, "but for the legal relationship between [the parent] and [the child], there is a high probability that the [child] could find a permanent adoptive home." A.D., 193 Wn. App. at 458.[14]

---

[13] In support of this assertion, Hopkins cites to Finding of Fact 2.259, which states: "[L.A.H.] is in a stable home, which is willing to be permanent and adopt."

[14] Hopkins contends that A.D. was wrongly decided. She asserts that the term "clearly" in RCW 13.34.180(1)(f) "means 'without a doubt or question.'" As such, she avers, the State must show "a high probability that the child's prospects of integrating into a permanent home are unquestionably diminished by the continuation of [the child's] relationship with [the] parent." In support of this argument, Hopkins cites to our decision in Woodley v. Style Corp., 7 Wn. App. 2d 543, 453 P.3d 739 (2019). However, Woodley concerned the meaning of the term "clearly excessive" in RCW 60.04.081, which is a statute addressing the rights of an owner of real

Accordingly, substantial evidence supports the trial courts finding under RCW 13.34.180(1)(f).

IV

Finally, Hopkins contends that substantial evidence does not support the trial court's finding that termination of her parental rights was in the best interests of L.A.H. According to Hopkins, "the record establishes [that] L.A.H.'s best interest is served in maintaining the status quo while his mother works through all recommended services." We hold that substantial evidence supports the trial court's finding.

"Once the court determines that the [State] satisfied its requirements in accordance with RCW 13.34.180(1), parental rights may be terminated if doing so is in the best interests of the child." K.M.M., 186 Wn.2d at 479 (citing RCW 13.34.190(1)(b)). The State "must prove that termination is in the best interests of the child by a preponderance of the evidence." K.M.M., 186 Wn.2d at 479. "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather that 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] s[eeks] to rehabilitate.'" In re Dependency of T.R., 108 Wn.

---

property to contest a frivolous claim of lien on the owner's property. 7 Wn. App. 2d at 559. Woodley has no bearing on the term "clearly" as contained within RCW 13.34.180(1)(f). In any event, A.D. was correctly decided. As previously explained, chapter 13.34 RCW emphasizes not only the child's right to a permanent home, but also the child's right to a speedy resolution of dependency proceedings. Accordingly, RCW 13.34.180(1)(f) may be satisfied when, but for the legal relationship between the parent and the child, there is a high probability that the child could be placed into a permanent home.

App. 149, 167, 29 P.3d 1275 (2001) (most alterations in original) (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

Here, the trial court found that "[i]t is in the best interest of [L.A.H.] that all of the parental rights of Kautia Hopkins be terminated." Finding of Fact 2.268. Substantial evidence supports this finding. Indeed, the unchallenged findings of fact demonstrate that Hopkins had been unable to rehabilitate over a lengthy dependency period. When the trial court entered the termination order, L.A.H. had been "out of home" for over two years. Findings of Fact 2.13 and 2.14. The trial court found that Hopkins "did not make progress in the area of substance abuse" and that she "continues to use methamphetamine, even during the pendency of this trial." Finding of Fact 2.248. Moreover, the trial court found that if Hopkins participated in all of her services, "it would be a minimum of 12 to 18 months" before she "could safely engage in reunification" with L.A.H. Finding of Fact 2.183.

Further, when Hopkins was faced with the termination of her parental rights concerning her three prior children, her "long term addiction to methamphetamines impaired her ability to even participate in, let alone parent, the dependencies related to two [of the] children, and caused her to relinquish her parental rights as to a third." Finding of Fact 2.217.

These unchallenged findings of fact provide substantial evidence in support of the following finding of fact, which is challenged by Hopkins:

> [L.A.H.] needs stability and a permanent home that can consistently and reliably provide the care he needs. The mother cannot provide that care at this time and will not be able to do so in the near future. As noted above, this child can no longer wait on his mother.

Finding of Fact 2.264.[15]

The record demonstrates that Hopkins was unable to rehabilitate over a lengthy dependency period.  Accordingly, substantial evidence supports the trial court's finding that termination of Hopkins' parental rights was in L.A.H.'s best interests.

Affirmed.

Duyn, J.

WE CONCUR:

Brumm, J    Andrus, A.C.J.

---

[15] Hopkins asserts that this finding of fact improperly implies that L.A.H. was not living in a stable home during the dependency.  Properly read, however, the first sentence of this finding of fact states that L.A.H.—like all children—has a right to a stable and permanent home.